22 October 1999

No. 2--98--0999

_________________________________________________________________

IN THE

APPELLATE COURT OF ILLINOIS

SECOND DISTRICT

_________________________________________________________________

In re
 MARRIAGE OF ) Appeal from the Circuit Court

) of Du Page County.

RICHARD DIVELBISS,    )

) No. 93--D--559

Petitioner-Appellee,   )

)

and       )

)

REBECCA DIVELBISS, n/k/a   )

Rebecca Maida,     ) Honorable

) Patrick J. Leston,

Respondent-Appellant.   ) Judge, Presiding.

_________________________________________________________________

JUSTICE RAPP delivered the opinion of the court:

Respondent, Rebecca Divelbiss, n/k/a Rebecca Maida, appeals the trial court's modification of joint custody providing that petitioner, Richard Divelbiss, be the residential custodian of the parties' minor child for five months of the year.  Rebecca also appeals the trial court's denial of her motion to strike the testimony of Richard's expert witness and the denial of her motion for a Rule 215 (166 Ill. 2d R. 215) examination.  We affirm.

This appeal involves a highly contested visitation and custody proceeding spanning more than six years.  Unfortunately for the child of the parties, this case has been fraught with tremendous hostility and bitterness between the parties.  The following facts, as shown in the record, are germane to our disposition.  Other facts, which have more limited relevancy, will be discussed in connection with the individual issues to which they pertain.

Richard and Rebecca were married March 11, 1984.  One child, S.D., was born of the marriage on August 15, 1984.  A judgment of dissolution of marriage was entered June 8, 1993.  Richard and Rebecca entered into a marital settlement agreement and a joint parenting agreement.  The joint parenting agreement provided that Rebecca have physical care of S.D. and that Rebecca and Richard share in parenting decisions.

Rebecca and her current husband, Daniel Maida, have one son together.  Rebecca is a daycare provider and Daniel is a police officer.

Richard has custody of three sons from a previous marriage.  Richard's current wife, Valerie, has two daughters who reside with them.

On October 6, 1995, Richard filed a petition for modification of custody seeking sole custody of S.D.  The hearing on Richard's petition commenced April 9, 1998.  Richard testified that he has a bachelor's degree in business economics and psychology as well as a master's degree in business administration and clinical social work.  Richard stated that he was finishing an internship with a homeless community and performing clinical family, group, and individual therapy.  Richard is employed as an engineer with Fermilab and has been a volunteer fireman for approximately 18 years.

Richard testified that Rebecca refuses to cooperate and interferes with visitations and that S.D. now resists visitations.  Richard also testified that Rebecca initiated a report with the Department of Children and Family Services (DCFS) for which he was investigated and subsequently arrested for allegedly choking S.D.  The result of the DCFS investigation was that Rebecca's report was unfounded and Richard was subsequently found not guilty of the alleged incident.  Rebecca has videotaped many of the visitation exchanges.  Richard also testified that he complained to the chief of police regarding Daniel Maida's conduct, for which Daniel was suspended for a few days.

Richard and Rebecca met with a social worker in an unsuccessful attempt to resolve their differences.  Richard then contacted Dr. Roger Hatcher, a child psychologist, for assistance, but Rebecca refused to cooperate.  S.D. began to refer to Richard as "Rick," instead of "Dad," and Richard noticed that S.D.'s last name was written on some of her homework and a book as "Maida."  The court previously ordered S.D. to attend counseling with a therapist.

Richard testified concerning his relationship with S.D. and several father-daughter outings they had enjoyed together.  According to Richard, he and S.D. enjoy cooking, woodworking, bicycling, camping and hiking, gardening, and various other activities.  Richard supervises S.D.'s Internet usage and assists with her homework.  Richard attends some of S.D.'s extracurricular activities.  He enrolled S.D. in riding lessons and instruction on the care of horses when she exhibited an interest in horses.

When visiting at Richard’s home, S.D. shares a bedroom with Richard's 16-year-old stepdaughter.  Richard's home has six bedrooms and is located only five or six blocks from Rebecca's home.  Richard stated that if S.D. were in his custody she would attend the same school she is currently attending.  S.D.'s best friend lives across the street from Richard's home.

Richard stated that S.D.'s relationship with his 16-year-old stepdaughter is sometimes good and sometimes bad.  According to Richard, S.D. likes his wife.

Richard testified that S.D. is in eighth grade and that during fourth grade she missed 38 days of school.  Richard believes that Rebecca is not consistent, that she exhibits periods of rage, and that her conduct is mentally harming S.D.  When S.D. is in public with Rebecca and Daniel, she ignores Richard and his family.

On cross-examination, Richard admitted that he has audiotaped Rebecca.  Richard also admitted bringing S.D. home early from one visitation, at S.D.'s request, due to an argument.  Richard did not recall a "sick building syndrome" at S.D.'s school during the year she missed 38 days of school.  Richard stated that he has custody of his three sons from a previous marriage and that he does not interfere with their mother's visitation.

Richard's wife, Valerie, testified that she is employed as an administrative assistant at the College of Du Page.  Valerie has two daughters from a previous marriage, who live with her and Richard.  Valerie and her daughters have taken S.D. shopping.  Valerie stated that S.D. does not like to sit at the dinner table but would rather watch television while eating.  Valerie has observed S.D. ignore Richard and his family in public when she is with Rebecca and Daniel.  Valerie believes that S.D. has a good relationship with her and Richard.  Valerie has observed Richard and S.D. interacting in various activities.

Laura Piaskowy, a child protection investigator with DCFS, testified that she investigated an incident report concerning S.D.  She concluded that the report was unfounded.

M.M. testified that she is 13 years old and that she is friends with S.D.  M.M. lives near S.D.'s father and attends the same school as S.D.  M.M. recalled that S.D. once visited with Richard for 30 days, during a time when Rebecca was to have no contact with S.D.  S.D. asked M.M. to call Rebecca periodically to tell her "hi" and "what's up."  M.M. would relay messages between S.D. and Rebecca about every other day during this time.  On cross-

examination, M.M. stated that she was not afraid of Richard.  S.D. told M.M. that Richard used to hit Rebecca.

Dr. Robert Shapiro, a clinical psychologist, testified that his relationship with the parties began in 1995 as the court-

appointed conciliator.  Dr. Shapiro initially met with Richard and Rebecca individually and performed psychological testing.  Rebecca’s psychological testing revealed a certain immaturity, self-centeredness, a low-level of energy, and some evidence that she would become irritable and easily annoyed when her needs were not met.  Richard’s psychological testing revealed that he was fairly self-confident, had a good level of energy, was outgoing and comfortable with himself, and had no indication of thought, character, or mood disorders.

Dr. Shapiro met with Richard and Rebecca together for four sessions in an attempt to mediate custody and visitation issues.  Richard brought S.D. to meet with Dr. Shapiro four times, and Rebecca brought S.D. to meet with him three times and was met by Richard in the waiting room.  Dr. Shapiro reviewed approximately 15 police reports, handwritten and typed notes of the parties, histories and accusations made by the parties about each other, a letter from Dr. Hatcher, and DCFS reports.  Dr. Shapiro also reviewed a letter written by S.D. that was found by Richard.  The letter concerned Dr. Shapiro because S.D. was only 11 years old at the time and the letter contained sexual fantasies that she was sharing with her friends.  Dr. Shapiro observed the parties being rude during sessions and, in particular, he noted that Rebecca yelled and was short-tempered and short-fused.  This had a profound effect on S.D., causing Dr. Shapiro to end the session.  Dr. Shapiro observed a warm, loving relationship between Richard and S.D. and a clear, positive bond between them.  Rebecca subsequently refused to allow Dr. Shapiro to interview Richard and S.D. together.  Rebecca's uncooperative conduct continued, causing Dr. Shapiro to write a letter to the judge requesting his assistance in gaining her cooperation.

Dr. Shapiro later met with Richard for an update.  A second conciliation was ordered and, in 1997, Dr. Shapiro met with S.D. individually, Richard and Rebecca jointly, and Richard individually.

Dr. Shapiro indicated that in 1996 his opinion was that a change of custody was not indicated and that there existed a parent alienation syndrome in that S.D. was being alienated from Richard.  Dr. Shapiro recommended, and the court ordered, that S.D. spend 30 days with Richard, with no contact from Rebecca. This 30-day visitation was to be followed by counseling to help S.D. "extricate herself from her parents' divorce and the way that she had become emotionally entangled in their divorce."

In Dr. Shapiro's second conciliation report he continued to suggest that a change of custody should not take place because there was a little less conflict and S.D. was enjoying her visits with Richard.  Dr. Shapiro still observed parent alienation syndrome and recommended therapy to deal with that issue and with the harm caused by S.D.'s testifying against Richard in a prosecution for the "choking" incident, which proved unfounded.

Dr. Shapiro's recommendation changed a year and a half after beginning the conciliation process when, in December 1996, the Maidas were purposely creating trouble for Richard and "There was just no stopping it."  Dr. Shapiro finally recommended, "based on all of this stuff that's happened over a long period of time and continues to happen unabated, and [S.D.] not getting the counseling she needed and the [parent] alienation continuing, that the only resource for [S.D.] having two parents in her life would be for her to live with [Richard]."  Thus, at the conclusion of the conciliation process, it was Dr. Shapiro's opinion that it was in S.D.'s best interest that residential custody be changed to Richard.  Dr. Shapiro opined that the present situation would adversely affect S.D.’s personality development, creating future problems such as academic, retention of jobs, following rules, and establishing intimate relationships.

On cross-examination, Dr. Shapiro admitted that in this case he did not perform a custody evaluation pursuant to the American Psychological Association guidelines but performed a custody evaluation pursuant to the conciliation program guidelines.  Dr. Shapiro indicated that he would be bothered if Richard had subpoenaed S.D. to testify at his trial.

On redirect examination, Dr. Shapiro stated that Rebecca, S.D., and Richard never told him of any problems between S.D. and her stepsiblings and that he believed they brought all of their problems to his attention.  Dr. Shapiro opined that in this case the joint parenting agreement had not worked.  Dr. Shapiro also stated that awarding custody of S.D. to Richard would thwart the parental alienation but that counseling would be needed to help eliminate it.

On re-cross-examination, Dr. Shapiro testified that he did not believe the conciliation guidelines had ever been presented to the American Psychological Association for approval.  Rebecca's counsel made a motion to strike Dr. Shapiro's testimony, arguing that he did not perform a custody evaluation.  The trial court denied the motion to strike Dr. Shapiro's testimony.

Rebecca testified about several incidents involving Richard.  She generally denied creating any visitation problems and stated that any visitation problems were caused by Richard's conduct.

Penny Hinze testified that she was visiting Rebecca in the spring of 1994 when Richard arrived for a visitation.  Penny observed S.D. become upset, cry, and tell Richard that she didn't want to go.  Penny then observed Richard sitting in his car in the driveway "revving" the engine for 5 or 10 minutes.  Penny went outside to tell Richard that he was upsetting S.D.  Richard then told Penny that Rebecca was a "lunatic" and began to describe how Rebecca was a "bad wife."  Penny also witnessed an incident in December 1993 at the Warrenville Community Center when Richard approached her and Rebecca, said that Rebecca was interfering with his visitation, and asked Rebecca to leave.  On cross-examination, Penny testified that she met Rebecca while attending a therapeutic support divorce group.  Penny admitted that she had recently discussed her testimony with Rebecca.

Rebecca's husband, Daniel Maida, testified that he is employed as a police officer for the City of Warrenville.  Daniel testified that Richard filed a complaint against him with his employer.  Daniel stated that a hearing was held but he was not reprimanded.  Daniel also testified that Richard filed another complaint against him with his employer and that he was not suspended as a result of the complaint.  Daniel admitted filing reports concerning Richard with DCFS and the Du Page County Forest Preserve.  Daniel explained that as a police officer he was required to make these reports but that he did not play an active role in the investigations.  Daniel and Rebecca have one child together with whom S.D. is "very close."

On cross-examination, Daniel admitted that the chief of police gave him two verbal reprimands as a result of the complaints filed by Richard.  On redirect examination, Daniel stated that after a hearing one of the reprimands was removed.

Daniel Maida, Sr., testified that he attended a football game with Rebecca, Daniel, and S.D.  Richard approached S.D. and said "do you want to come and sit with your real family."  On cross-

examination, Mr. Maida, Sr., stated that before the game started S.D. waved to Richard and his family and they waved back.

Several other witnesses testified to observing various incidents involving Richard, previously testified to by other witnesses.  S.D. testified, 
in camera
, that she did not want to live at her father's house.

After hearing closing arguments, the trial court denied Richard's petition for sole custody.  However, the trial court modified residential custody, ordering that Richard take custody beginning the first Saturday after the close of the school year until the first Saturday in November.  The trial court also made provisions for visitations, vacations, and telephone contact.  In making its ruling, the trial court found by clear and convincing evidence that there had been a change in circumstances and that modification was necessary to serve the best interest of the child.  The trial court found evidence of substantial parental alienation, which would require that S.D. spend an extended period of time with Richard with less interference from Rebecca.  The trial court noted that Richard and Rebecca live in close proximity to each other so that school and friends were not an issue.  The trial court also felt it was important for S.D. to spend part of the school year with her stepsiblings.  Rebecca timely appealed.

On appeal, Rebecca argues that (1) the trial court erred in modifying residential custody because (a) the presumption in favor of her, as the current custodial parent, was not overcome by clear and convincing evidence; and (b) the modification of residential custody is not in the best interest of the minor child; (2) the trial court should have stricken Dr. Shapiro's testimony because he did not render an expert opinion within the standard of his profession; and (3) the trial court erred in denying her request for a Rule 215 (166 Ill. 2d R. 215) evaluation.

[Nonpublishable material removed under Supreme Court Rule 23.]

WHETHER THE TRIAL COURT ERRED IN MODIFYING RESIDENTIAL CUSTODY.

Rebecca first argues that the trial court erred in modifying residential custody. A decision regarding child custody modification will not be disturbed on appeal unless it is against the manifest weight of the evidence.
  
In re Marriage of Karonis
, 296 Ill. App. 3d 86, 88 (1998).  In determining whether a judgment is contrary to the manifest weight of the evidence, the reviewing court views the evidence in the light most favorable to the appellee.  
In re Marriage of Admire
, 193 Ill. App. 3d 324, 329 (1989).  Where the evidence permits multiple reasonable inferences, the reviewing court will accept those inferences that support the court's order.  
Nemeth v. Banhalmi
, 125 Ill. App. 3d 938, 963 (1984).  We will affirm the trial court if there is any basis to support the trial court's findings.  
Tomaso v. Plum Grove Bank
, 130 Ill. App. 3d 18, 23 (1985).

A custody determination, in particular, is afforded "great deference" because the trial court is in a superior position to judge the credibility of the witnesses and determine the best interests of the child.  See 
In re Marriage of Gustavson
, 247 Ill. App. 3d 797, 801 (1993).

 (a) WHETHER THE PRESUMPTION IN FAVOR OF REBECCA, AS THE CURRENT CUSTODIAL PARENT, WAS OVERCOME BY CLEAR AND CONVINCING EVIDENCE.

Rebecca argues that the presumption in favor of her, as the current custodial parent, was not overcome by clear and convincing evidence.  Section 610(b) of the Illinois Marriage and Dissolution of Marriage Act (the Act) provides:

"The court shall not modify a prior custody judgment unless it finds 
by clear and convincing evidence
, upon the basis of facts that have arisen since the prior judgment or that were unknown to the court at the time of entry of the prior judgment, that a change has occurred in the circumstances of the child or his custodian, or in the case of a joint custody arrangement that a change has occurred in the circumstances of the child or either or both parties having custody, and that modification is necessary to serve the best interest of the child.  In the case of joint custody, if the parties agree to a termination of a joint custody arrangement, the court shall so terminate the joint custody and make any modification which is in the child's best interest.  The court shall state in its decision specific findings of fact in support of its modification or termination of joint custody if  either parent opposes the modification or termination."  (Emphasis added.)  750 ILCS 5/610(b) (West 1996).

The "clear and convincing" standard is intended to favor the present custodial parent in order to promote stability and continuity in the child's custodial and environmental relationships.  
In re Marriage of Nolte
, 241 Ill. App. 3d 320, 325 (1993).

We have closely scrutinized the trial proceedings in this matter.  After considering all of the evidence, the trial court found that Richard had proved by clear and convincing evidence that there had been a change in circumstances, that modification was warranted under section 610(b) of the Act, and that factors under section 602 of the Act (750 ILCS 5/602 (West 1996)) overwhelmingly dictated that the best interests of the child would be served by modifying residential custody.

Rebecca asserts that the trial court's modification of residential custody was against the manifest weight of the evidence.  She argues that the trial court "accepted Dr. Shapiro's belief that parental alienation had occurred, although it was not intentionally done by [Rebecca]."  Rebecca further argues that the trial court failed to consider that Dr. Shapiro indicated that the blended family of Richard, his three sons, Rebecca, and S.D. had not worked.  Rebecca further argues that S.D. has always been loyal to her and that there has been no change in S.D.'s loyalty; thus, Rebecca concludes that there has been no change in circumstances to warrant the modification of residential custody.  We disagree with Rebecca's arguments.

In its May 22, 1998, oral pronouncements, the trial court specifically found that Rebecca was unwilling to facilitate and encourage a close and continuing relationship between S.D. and Richard; that Rebecca repeatedly denied visitations and her conduct generated problems with visitations; and that Rebecca was involved in an "unrelenting persecution" of Richard, repeated instances of unsubstantiated reports to DCFS, and the recruitment and involvement of her husband, Daniel Maida, a police officer, in this matter.  The trial court stated that it found particularly discouraging Rebecca's repeated videotaping of the visitation exchanges, which it believed Rebecca had recruited and involved S.D. in staging.  The trial court also found that Rebecca had circumvented the 30-day no-contact order.  The trial court concluded that Rebecca's conduct had not been conducive to fostering a good relationship between S.D. and Richard.

After considering Dr. Shapiro's recommendations, together with the testimony and evidence, the trial court ordered a modification of residential custody and ongoing therapy in an attempt to break the cycle of parental alienation and to assist S.D. in her adjustment.

The record indicates that the trial court considered all matters relevant to child custody.  The fact that the trial court did not accept Rebecca's view does not mean that its decision was erroneous.  See 
Nemeth
, 125 Ill. App. 3d at 963. 
 We conclude that the trial court did not err in finding that Richard met his burden of proof by clear and convincing evidence on the basis of new circumstances or previously unknown facts that a change in residential custody was necessary to serve the best interests of the child.

WHETHER MODIFICATION OF RESIDENTIAL CUSTODY WAS IN THE BEST INTERESTS OF THE MINOR CHILD.

Rebecca argues that shared residential custody is not in S.D.'s best interests.  Section 602 of the Act provides, in relevant part:

"(a) The court shall determine custody in accordance with the best interest of the child.  The court shall consider all relevant factors including:

(1) the wishes of the child's parent or parents as to his custody;

(2) the wishes of the child as to his custodian;

(3) the interaction and interrelationship of the child with his parent or parents, his siblings and any other person who may significantly affect the child's best interest;

(4) the child's adjustment to his home, school and community;

(5) the mental and physical health of all individuals involved;

(6) the physical violence or threat of physical violence by the child's potential custodian, whether directed against the child or directed against another person;

(7) the occurrence of ongoing abuse as defined in Section 103 of the Illinois Domestic Violence Act of 1986 [(750 ILCS 60/103 (West 1996))], whether directed against the child or directed against another person; and

(8) the willingness and ability of each parent to facilitate and encourage a close and continuing relationship between the other parent and the child.

***

(b) The court shall not consider conduct of a present or proposed custodian that does not affect his relationship to the child.

(c) Unless the court finds the occurrence of ongoing abuse as defined in Section 103 of the Illinois Domestic Violence Act of 1986, the court shall presume that the maximum involvement and cooperation of both parents regarding the physical, mental, moral, and emotional well-being of their child is in the best interest of the child.  There shall be no presumption in favor of or against joint custody."  750 ILCS 5/602 (West 1996).

Illinois courts have expressed their disfavor of "alternate" or "rotating" custody arrangements, particularly when these arrangements involve 
young
 children.  In 
Davis v. Davis
, 63 Ill. App. 3d 465 (1978), the Appellate Court, Fifth District, reversed an "alternate custody award" in which the physical custody of the children was to shift from one party to the other every four months.  The court in 
Davis
 noted:

"[A]lternate custody awards should be made only in certain exceptional situations.  Rarely does the 'Solomonic' approach to custody inure to the benefit of the 
young
 child.  In reality, it is usually employed to appease the selfish desires of the parties.  The danger that the child will feel that he has no fixed or permanent home is particularly acute where, as here, the child is shifted every four months, including a move during the school term."  (Emphasis added.)  
Davis
, 63 Ill. App. 3d at 470.

In 
In re Marriage of Oros
, 256 Ill. App. 3d 167 (1994), the 
Appellate Court, Fourth District, reversed a joint custody order in which a 
young child was rotated every three months between his parents' residences in different cities.  The court noted the confusion and emotional problems experienced by this young child during the three years he had been "subjected to a merry-go-round of changing preschools, doctors, playmates, households and environments."  
Oros
, 256 Ill. App. 3d at 170.

We believe that the instant case is distinguishable from 
Davis
 and 
Oros
.  Here, we are not dealing with a child of tender years; rather, S.D. is now 15 years old and quickly approaching adulthood.  The arrangement fashioned by the trial court does not require S.D. to change schools, doctors, or friends since Richard and Rebecca live in close proximity.  We recognize that it is often difficult to organize time for visitations because of children's activities as they move toward adulthood.  This custody arrangement should enable S.D. to foster and maintain a close and continuing relationship with both parents.

The record reveals that the trial court carefully considered all the relevant factors under section 602 of the Act and concluded that S.D. needed to spend an uninterrupted extended period of time with Richard, with less interference from Rebecca, to thwart the parental alienation caused by Rebecca. Under the unique circumstances of this case, we find that the shared residential custody arrangement ordered by the trial court was in S.D.'s best interest.

For the foregoing reasons, we find that the trial court's decision was not contrary to the manifest weight of the evidence.

(2) WHETHER THE TRIAL COURT SHOULD HAVE STRICKEN DR. SHAPIRO'S TESTIMONY.

Rebecca next argues that the trial court should have stricken Dr. Shapiro's testimony because he did not render an expert opinion within the standard of his profession.  Rebecca relies on 
In re Marriage of Hazard
, 167 Ill. App. 3d 61, 67 (1988), in which the Appellate Court, First District, affirmed the trial court's striking the testimony of a psychiatrist who admitted that he did not follow the standards of his own profession in arriving at his opinion regarding custody.  The psychiatrist admitted that he relied on reports of other persons rather than personally interviewing the people involved or basing his conclusions on reliable medical evidence or certain other reliable evidence as required by the standards of his profession.  The court held that the psychiatrist's testimony was properly excluded "as it was based on evidence which is considered unreliable according to the standards of the psychiatric profession."  
Hazard
, 167 Ill. App. 3d at 67.

Hazard
 is distinguishable from the circumstances of this case.  Here, the trial court appointed Dr. Shapiro, a psychologist, to conduct a conciliation process in accordance with the conciliation guidelines of the Eighteenth Judicial Circuit.  Dr. Shapiro interviewed Richard, Rebecca, and S.D. numerous times during the year and a half he was involved with them in the conciliation process.  Dr. Shapiro testified that he followed the conciliation guidelines in conducting his examination and in arriving at his opinion regarding custody.  Under these circumstances, we hold that the trial court properly denied Rebecca's motion to strike Dr. Shapiro's testimony.

(3) WHETHER THE TRIAL COURT ERRED IN DENYING REBECCA'S REQUEST FOR A RULE 215 EVALUATION.

Finally, Rebecca argues that the trial court erred in denying her request for a custody evaluation pursuant to Supreme Court Rule 215 (166 Ill. 2d R. 215).  Rebecca contends that, although her motion for a Rule 215 examination was granted, the trial court would not allow a custody evaluation to be conducted.  We find no merit in this argument.

Rule 215 provides, in relevant part:

"In any action in which the physical or mental condition of a party or of a person in the party's custody or legal control is in controversy, the court upon notice and on motion made within a reasonable time before trial, may order such party to submit to a physical or mental examination by a licensed professional in a discipline related to the physical or mental condition which is involved."  166 Ill. 2d R. 215.

In granting Rebecca's motion for a Rule 215 examination, the trial court stated:

"Mental examination [and] custody is the issue but it's their mental condition as it relates to the issue of custody.  I don't expect to get recommendations from his doctor as to custody.

I expect to get opinions and impressions with respect to his mental condition and how that affects his ability to parent and to be the custodial parent but this isn't a custody evaluation."

The trial court further stated:

"It is a mental examination of your client, and what is relevant for the purpose of the examination is to determine his mental status as its relates to his ability to parent or to be the custodial parent.

This isn't a custody evaluation.  This isn't your expert sitting down and doing the same type of evaluation that Dr. Shapiro has done."

Rebecca's attorney argued that she had a right to seek a custody evaluation, to which the trial court replied, "That is not what a 215 examination is, though."  Rebecca's counsel stated, "Then, your Honor, you are prohibiting my client from obtaining an expert to give a custody opinion."  The court responded, "You filed a motion for 215 exam.  I granted that motion."

Rebecca relies on 
In re Marriage of Cohen
, 189 Ill. App. 3d 418 (1989), in arguing that it was an abuse of discretion to deny her request for a custody evaluation.  However, 
Cohen
 held that the trial court abused its discretion when it denied a request for a Rule 215 examination in a custody case where it was alleged that the children were sexually abused by one of the parents, making the physical and mental condition of the children and parents a material issue.  
Cohen
, 189 Ill. App. 3d at 423.

The record reveals that Rebecca requested mental examinations of Richard and S.D. pursuant to Rule 215, "relative to the issues pending in this matter to be conducted by Dr. Nancy Hornstein."  The trial court granted Rebecca's motion for a Rule 215 examination, and it appears that she did not pursue the mental examinations.

We assume that Rebecca intended the trial court to order an investigation and report concerning custodial arrangements for the child, although she made no request for this.  Section 605 of the Act (750 ILCS 5/605 (West 1996)) provides the authority to order such investigations.  Section 605(a) provides in part:

"In contested custody proceedings, and in other custody proceedings if a parent or the child's custodian so requests, the court may order an investigation and report concerning custodial arrangements for the child."  750 ILCS 5/605 (West 1996).

Here, Rebecca made no specific request for an investigation under section 605 of the Act.  We therefore find no abuse of discretion in the trial court's failure to order an investigation concerning custodial arrangements in the absence of Rebecca's specific request.  See 
Hollo v. Hollo
, 131 Ill. App. 3d 119, 127 (1985).

CONCLUSION

According to the record, it appears that the parties have been able to cooperate a little better in the last couple of years.  In S.D.'s best interest, we encourage the parties to cooperate with one another during the last few years of her precious childhood.

Nothing in the record of this appeal suggests that the trial court's decision was against the manifest weight of the evidence or was a clear abuse of the trial court's discretion.  On the contrary, the trial record discloses a conscientious judge's attempt to apply the law of Illinois to resolve an extremely difficult case.  

For the foregoing reasons, we affirm the judgment of the circuit court of Du Page County.

Affirmed.

INGLIS and McLAREN, JJ., concur.