No. 2--05--0971                                          filed: 7/31/06

_____

IN THE

APPELLATE COURT OF ILLINOIS

SECOND DISTRICT

_____

_____

| | | |
|---|---|---|
| In re MARRIAGE OF | ) | Appeal from the Circuit Court |
| CHRISTOPHER M. GAMBLA, | ) | of Du Page County. |
| | ) | |
| Petitioner-Appellant, | ) | |
| | ) | |
| and | ) | No. 03--D--1116 |
| | ) | |
| KIMBERLY K. WOODSON, | ) | Honorable |
| | ) | C. Stanley Austin, |
| Respondent-Appellee. | ) | Judge, Presiding. |

_____

_____

JUSTICE GILLERAN JOHNSON delivered the opinion of the court:

The petitioner, Christopher Gambla, appeals, pro se, from the September 1, 2005, order of the circuit court of Du Page County dissolving his marriage to the respondent, Kimberly Woodson. On appeal, Christopher argues that the trial court erred in awarding custody of the parties' minor child, Kira Marie, to Kimberly.

I. FACTUAL BACKGROUND

The parties were married on May 11, 2002, in Atlanta, Georgia. Christopher is Caucasian, and Kimberly is African-American. Shortly after they married, the parties moved to Illinois, along with Che Woodson, Kimberly's then six-year-old son from a previous marriage. One child was born to the parties' marriage: Kira Marie, born on October 19, 2002. On May 13, 2003, Christopher filed a petition for dissolution of marriage in which he sought sole custody of Kira. On May 14, 2003,

Kimberly filed a counterpetition for dissolution of marriage in which she also sought sole custody of Kira.

Between May 31, 2005, and July 5, 2005, the trial court conducted 15 days of trial, at which the parties, one court-appointed expert, three experts retained by Kimberly, and several character witnesses testified. Their testimony is as follows.

A. Christopher's and His Witnesses' Testimony

1. Christopher

Christopher testified that he lives in West Chicago, Illinois, along with his sister and her husband and their three children. Christopher's mother lives in an apartment on the lower level of the residence. Christopher has owned the home since August 1997. Christopher's office is in his home. He is a transportation consultant with Lea and Elliot, a company that designs and implements railway systems worldwide. Christopher has worked for Lea and Elliot since March 2001. Christopher has an undergraduate degree in business from the University of Dubuque, Iowa, and a master's degree in business from Benedictine University in Lisle, Illinois.

Christopher started dating Kimberly in March 2000. The parties stopped dating in November 2001, but resumed the relationship in January 2002. Kimberly became pregnant in February 2002. At this time, Kimberly was residing in Georgia and Christopher was residing in Texas. After the parties relocated to Illinois in June 2002, they moved into the lower-level apartment of Christopher's home in West Chicago. Christopher's mother moved up to the main level with his sister and her family. Christopher did not observe any problems between Kimberly and his mother or between Kimberly and his sister and her family.

In September 2002, Kimberly informed Christopher that she was unhappy living in the West Chicago home, because she felt uncomfortable around his family. Subsequently, the parties moved

into an apartment in Wheaton. According to Christopher, he was involved in Kimberly's prenatal care and was present for the birth of Kira at Central Du Page Hospital. The parties had planned to have a home birth. After complications ensued during Kimberly's labor, Christopher was instrumental in getting Kimberly to the hospital.

Following Kira's birth, Kimberly started to exhibit bizarre behaviors that led him to suspect she was depressed. A few weeks after Kira's birth, Kimberly insisted on taking Che and Kira to Atlanta to visit her family for Thanksgiving. Although he did not agree with the trip, he accompanied Kimberly. On the drive to Atlanta, Kimberly refused to eat or speak. About a month after Kira's birth, Christopher came home and found Kimberly sleeping in the closet, curled up in a fetal position. A few months after Kira was born, Christopher and Kimberly got into a verbal disagreement that escalated into Kimberly striking Christopher with a shirt while he was holding the baby.

Christopher testified that he and Kimberly frequently disagreed regarding the care of Kira. For example, ten days following Kira's birth, Kira needed treatment because of a discharge from her right eye. Kimberly refused a medicine, known as erthromycin, for Kira's eyes. Kimberly told Christopher that she did not want Kira to have the drug because she feared that it would interfere with breast-feeding. Kira has since had eye problems such as conjunctivitis and styes. Additionally, Kira was not given her immunizations on schedule, because Kimberly did not want her to receive all the immunizations at once. Christopher also disagreed with several trips that Kimberly took with Kira to New Jersey, North Carolina, Atlanta, and Alabama, because of Kira's young age.

Christopher testified regarding a three-week trip that Kimberly took with Che and Kira to Atlanta in May 2003 to be with her mother following her mother's cataract surgery. Christopher had planned to fly to Atlanta on the weekends so that he could spend time with Kira. The second

weekend that Christopher flew to Atlanta, he was unable to visit with Kira, because Kimberly had taken her on a road trip to Birmingham, Alabama. Christopher cancelled his trip to Atlanta the third weekend because Kimberly informed him that she would be visiting family in Charlotte, North Carolina. He instead flew down on a Thursday. Christopher went to Kimberly's Georgia home, but was not permitted to enter. Kimberly initially refused to let Christopher take Kira, but eventually allowed him to take Kira to his hotel for a few hours.

In June 2003, when Kimberly returned from her trip to Atlanta, she moved out of the marital bedroom and into Che's room, whom she had left in North Carolina to attend school. Kimberly did not tell Christopher for several months what had happened to Che. Christopher always had enjoyed various activities with Che, such as flying kites and going to the park. Kira's crib remained in the marital bedroom. Kimberly cared for Kira during the day while Christopher was at work, and Christopher cared for Kira in the evening and on the weekend. During his evening time, Christopher would feed and bathe Kira and prepare her for bed. Kimberly was breast-feeding Kira and would pump breast milk for Christopher to feed Kira.

In February 2004, about the time Dr. Daniel Hynan performed a custody evaluation on the parties, Kimberly started feeding and bathing Kira and preparing her for bed. Christopher asked to resume these duties but Kimberly would not agree. Kira did continue to sleep in Christopher's room. Christopher eventually began to take Kira to his West Chicago home so that he could have more parenting time with her. Kimberly and Kira moved out of the apartment in September 2004. Kimberly did not tell Christopher where she was moving.

Christopher recalled an incident in March 2004 when he returned from work and noticed that Kira had red blotches all over her body. He asked Kimberly what had happened to Kira, and Kimberly responded that she did not know. Christopher went to the drug store and purchased some

children's Benadryl. Christopher administered to Kira a dose of the Benadryl and her symptoms improved. The following day, Kimberly told Christopher that Kira had eaten a peanut butter cookie. Christopher knew that Che was allergic to peanuts, so he took Kira to Wheaton Pediatrics to have her tested for allergies. Dr. Grunewald diagnosed Kira as allergic to peanuts. According to Christopher, Kira receives her allergy medication only when she is with him.

Christopher testified that Kimberly continues to breast-feed Kira but no longer provides Christopher with any breast milk to feed her. Christopher further testified that he and Kimberly disagree about whether to feed Kira meat and whether to provide Kira with fluoridated water. Christopher would like Kira's diet to include chicken, pork, beef, and fish. He also would like Kira to have fluoridated water. According to Christopher, Kimberly is very concerned about the cost of diapers and does not change Kira as often as he does. Kimberly often accuses Christopher of being controlling.

## 2. Dr. Hynan

Dr. Daniel Hynan, whom the parties stipulated to be qualified as an expert, testified that he was a licensed psychologist ordered to perform a custody evaluation regarding the instant case. Dr. Hynan prepared a report recommending that Christopher be given sole custody of Kira. In his report, Dr. Hynan noted that Kimberly is a full-time homemaker. Kimberly has family in Charlotte, North Carolina, and in the Atlanta, Georgia, area. Kimberly was seeking to remove Kira to North Carolina to be near her family there. Kimberly intends to seek full- or part-time employment as a nurse and hopes to be able to share a nanny with her niece, who is pregnant. Kimberly indicated in an interview with Dr. Hynan that she had experienced depression after she delivered Kira but that she opted not to pursue medication, because she was breast-feeding. Kimberly also indicated that

she is interested in pursuing a holistic or alternative approach to Kira's health care and was reluctant to have Kira immunized.

Kimberly completed the Minnesota Multiphasic Personality Inventory-2 (MMPI-2), a test that measures emotional and personality functioning. Kimberly answered questions in a somewhat defensive manner that is associated with limited personal insight. Despite her defensiveness, Kimberly had a significant elevation on a scale that indicates impulsiveness, difficulty with authority, and limited frustration tolerance. She also had an elevation on a supplemental scale that indicates the use of repression as a psychological defense, and she had an elevation close to the standard cutoff point on a scale that indicates low impulse control.

Kimberly also completed the Adult-Adolescent Parenting Inventory, a measure of parenting attitudes and beliefs. Kimberly scored better than average on scales that measure empathy, disciplinary style, and maintaining an appropriate parental role. She scored average on a scale that measures the appropriateness of developmental expectations. Dr. Hynan opined, however, that Kimberly's defensiveness calls into question the validity of the parenting test results.

Dr. Hynan noted that Christopher is employed full-time and has family in the West Chicago and Chicago areas. If Christopher is granted custody of Kira, his sister, with whom he resides, would care for Kira during working hours. Kira would share a room with Christopher for the time being and later share a bedroom with her cousin Anna. Christopher reported that he has not experienced any significant psychological problems, although he has felt distressed over the break-up of his relationship with Kimberly. Christopher advocates conventional health care for Kira.

Christopher took the MMPI-2 test. Christopher had elevations on supplemental scales that represent beliefs about social responsibility and working actively on controlling anger. That said, Christopher answered questions highly defensively, which, according to Dr. Hynan, calls into

question the validity of the personality-test results. Dr. Hynan believes that Christopher's elevations are likely due to his defensiveness.

Christopher also completed the Adult-Adolescent Parenting Inventory. He scored better than average on all of the scales. However, Christopher again answered questions defensively, calling into question the validity of the parenting-test results.

Dr. Hynan based his recommendation that Christopher be granted sole custody primarily on two reasons, one being that he believed that the statutory factor of the interaction of the child with the parents and siblings favored Christopher. Dr. Hynan explained that he was concerned about Che's diagnosis and problems with attention deficit disorder and whether Kimberly was properly treating Che for it. Dr. Hynan also explained that he was concerned with Kimberly's preference for alternative health care.

The second reason upon which Dr. Hynan based his recommendation was that he believed that the statutory factor of the willingness and ability of each parent to facilitate and encourage a close and continuing relationship between the other parent and the child favored Christopher. Dr. Hynan acknowledged that each party voiced a willingness and ability to facilitate a good relationship between Kira and the other parent. Additionally, both parties were participating in a routine in which Kira had good access to both parents. However, Kimberly was pursuing a removal petition, which would make it much more difficult for a close and continuing relationship between Christopher and Kira. Dr. Hynan stated that Kimberly's removal petition "had a major impact in that obviously that's what her primary wish was to do, and perhaps, obviously, it therefore, needed to be considered, because it was part of the order to consider it."

Dr. Hynan opined that joint custody would not be in Kira's best interest, due to the parties' lack of communication and significant disagreements over health care. Additionally, Dr. Hynan

cited the parties' differing preferences about Kira's schooling. Christopher would like Kira to attend a parochial school and be raised Catholic. Kimberly would like Kira to attend a public school and be exposed to different religious denominations.

### 3. Dr. Hatcher

Dr. Roger Hatcher, whom the parties stipulated to be qualified as an expert, testified that he was a licensed psychologist ordered to perform a custody evaluation regarding the present case. Dr. Hatcher prepared a report, similar to Dr. Hynan's, recommending that Christopher be given sole custody of Kira. Dr. Hatcher reported that Kimberly presented as an attractive, well-dressed woman with good hygiene. Kimberly was fully cooperative, appeared thoughtful in her responses, and articulated her concerns about the divorce and custody struggle very well. Kimberly gave no indication of psychiatric distress, but did appear somewhat guarded and controlled.

Dr. Hatcher testified that he relied on Dr. Hynan's MMPI-2 test results, which showed a "mild clinical level elevation of the four scale." According to Dr. Hatcher, individuals with Kimberly's profile often struggle with self-centeredness and have difficulty maintaining long-term relationships, due to their tendencies to put their own needs before the needs of others. Kimberly is likely seen by others as somewhat immature, narcissistic, and egocentric. Although Kimberly is likely to make a good first impression and others may see her as outgoing and energetic, she tends to be inwardly resentful and antagonistic when she feels mistreated. However, Kimberly's feelings of anger and aggression are more likely expressed in passive and indirect ways rather than through physical attack or confrontation. Dr. Hatcher believed that although Kimberly's responses on the MMPI-2 test administered by Dr. Hynan showed a mild level of guardedness, her test results were valid.

Dr. Hatcher administered to Kimberly the Millon Clinical Multiaxial Inventory-3 (MCMI-3) test. Kimberly scored well on the Modifying Indices Scale, indicating that her answers were forthright and honest. There were no findings of significant psychiatric disorders, such as depression. There was a significant elevation of the Narcissistic Personality scale. Kimberly's narcissistic tendencies are evident mostly in her difficulties with empathy and the development of close relationships and in her tendency to put her own needs ahead of the needs of others.

Dr. Hatcher reported that Christopher was alert and appropriately neatly-dressed. Christopher was anxious about the divorce and custody proceedings and articulate in expressing his concerns. Christopher gave no indication of psychological impairment. Dr. Hatcher did note that Christopher tended to be a rather carefully organized, compulsive individual, who provided "reams of written documentation" and scrutinized every comment of the examiner.

Dr. Hatcher opined that Christopher's results on the MMPI-2 test administered by Dr. Hynan were also valid, despite Christopher's reported defensiveness. Christopher did not have any significant elevations on any of the clinical scales of the MMPI-2.

Dr. Hatcher administered to Christopher the MCMI-3 test. Christopher's test responses were open and nondefensive. The test gave no indications of personality pathology or major psychiatric disorders. However, there was a significant elevation of the Compulsive Personality Subscale, which suggests that Christopher tends to be tightly controlled, somewhat obsessive, and overly attentive to details. Dr. Hatcher explained that these characteristics may be a great benefit to many people in their chosen professions, as such people would be unlikely to be forgetful in carrying out their assigned duties. However, when taken to extremes, these characteristics can be irritating to others, especially when they cause one to over respond to relatively minor concerns.

Dr. Hatcher noted that Kira was a happy, normal-sized child. She was healthy, affectionate, and social with family and friends. Dr. Hatcher observed Kira during two play sessions, one with Kimberly and one with Christopher. Dr. Hatcher reported that Kimberly interacts with Kira in a quiet, soft-spoken manner. Kira was comfortable and affectionate with Kimberly during the play session. Christopher has a more outgoing parenting style and is verbal and instructive when playing with Kira. Kira clearly enjoyed herself during the play session with Christopher.

Kimberly reported to Dr. Hatcher that she had changed her plans to pursue removal of Kira to North Carolina, because she believes that such a move would make it difficult for Kira to enjoy a relationship with Christopher. However, Kimberly would like to move from Wheaton into a more diverse community such as Homewood, Oak Park, or Evanston. Kimberly would like to start Kira in a Montessori school program and then would like Kira to continue on to public school. Kimberly would also consider a private school. Kimberly has agreed to let Christopher have Kira baptized in the Catholic church, but she would also like to expose Kira to other religions.

Kimberly indicated to Dr. Hatcher that she would look for a pediatrician and a dentist for Kira  who have attitudes about health care similar to her own. Kimberly acknowledged that her attitudes regarding health care are nonconventional but maintained that numerous medical professionals around the country share her views. Kimberley provided Dr. Hatcher with several articles and books that support her positions.

Christopher plans to live in his home in West Chicago. He would have the advantage of relatives within the household who would care for Kira while he was working. Christopher intends to raise Kira as a Catholic. At times, he takes Kira to Sunday mass with him. He would enroll Kira in a Catholic school located in Warrenville. In regard to Kira's health care, Christopher would like her to see his family practitioner.

According to Dr. Hatcher, both parties were fit and competent to independently care for Kira. However, like Dr. Hynan, Dr. Hatcher recommended that Christopher be given sole custody of Kira, based on Kimberly's nonconventional views regarding health care and his belief that Christopher would better encourage the noncustodial parent-child relationship. As to Kimberly's views on health care, Dr. Hatcher described them as "unusual, perhaps eccentric." As to the ability to encourage Kira to maintain a close relationship with her noncustodial parent, Dr. Hatcher explained that Christopher was more open and articulate, while Kimberly was more closed in her interactions. Dr. Hatcher also cited Kimberly's attempt to remove Kira from Illinois.

### 4. Arlene Gambla

Arlene Gambla, Christopher's mother, testified that she helps care for Kira at times when Christopher has visitation and he is working. Christopher generally works Monday through Friday, in his home office. Christopher usually has Kira dressed and ready before he goes to his office. During the day, Kira often plays in the backyard on the swingset and in the sandbox. Kira naps between 11 a.m. and 1 p.m. Before Kira lies down for her nap, Arlene reads Kira a devotional book she bought for Kira for Christmas. After Kira wakes up from her nap, Christopher has lunch with Kira. At 5 p.m., Christopher gets off work and takes over Kira's care. Christopher feeds Kira dinner, bathes her, and dresses her for bed. Christopher often reads to Kira and says prayers with her before he puts her down for bed.

Arlene does not communicate with Kimberly very often. When Kira is with Arlene, Kira often talks about Kimberly. Arlene believes that it is normal for Kira to talk about her mother and does not discourage her. Arlene believes that it is difficult for Kira when she is exchanged between parents. During the exchange, Kira's eyes get real big and dart back and forth. Arlene has never heard Christopher say anything unpleasant about Kimberly in front of Kira.

### 5. Anthony Morello

Anthony Morello, Christopher's brother-in-law and Kira's godfather, testified that he has observed Christopher interact with Kira. Christopher is very caring and loving toward Kira. Christopher is always focused on Kira's needs. Christopher cooks for Kira, bathes her, and reads to her. Christopher takes Kira to the park and the zoo on weekends. Kira has a great relationship with all of Anthony's children, especially his daughter Anna, with whom Kira now shares a room. Anthony's two sons treat Kira like a sister.

### 6. Rajkumar Rambhajan

Rajkumar Rambhajan testified that he worked with Christopher at O'Hare Transit System, where Christopher was a supervisor. Christopher supervised several African-American employees, as one-third of the company employees were minorities. Christopher never had any difficulties interacting with his African-American employees.

### B. Kimberly's and Her Witnesses' Testimony

### 1. Kimberly

Kimberly testified that she lives in Naperville with Che, Kira, and her mother, Marian Woodson. Che is 9 and Kira is 2½. Kimberly's residence is a single-family home, with three bedrooms, a den, and a large yard.

Kimberly attended Rutgers University in New Jersey, where she obtained a bachelor of arts degree in biology and African-American studies. Kimberly also attended New York University, where she earned an undergraduate degree in nursing. Kimberly is a licensed nurse in Illinois. In addition to her undergraduate degrees, Kimberly has a master's degree in public health from Emory University, which enables her to do epidemiological studies and community needs assessments and to implement community health promotion programs. Kimberly has also completed two semesters

at Emory University toward a master's degree in nursing, which she plans to complete. Finally, Kimberly earned a certificate in child growth education, through a correspondence course. Kimberly put her studies on hold when she became pregnant with Kira. Kimberly and Christopher had decided that Kimberly would be a stay-at-home mom.

Kimberly moved into Christopher's West Chicago residence in June 2002. They had planned to live there temporarily and then purchase a home of their own. Kimberly was uncomfortable living in Christopher's West Chicago residence, because she did not like how his family treated Che. For example, Che was not allowed to play on the backyard swingset, although the other children were permitted to do so. Kimberly also believed that Christopher was overly critical of Che and reprimanded him too frequently.

Kimberly testified that Christopher's criticism of her as a parent started when Kira was born. Christopher stayed home with Kimberly for three or four days following Kira's birth. During that time, they had a conversation about religious beliefs and how they would raise the children with regard to religion. The conversation quickly turned into an argument, and Christopher called Kimberly ungrateful and lazy and accused Kimberly of almost killing Kira with her attempt at a home birth.

In November 2002, Kimberly attended counseling for postpartum depression. Christopher attended one of Kimberly's counseling sessions and read aloud a 14-page document in which he questioned Kimberly's religious practices, child-rearing ability, and communication skills.

Kimberly recalled the incident in which Christopher claims that she hit him with a shirt. As Kimberly remembers, one evening in December 2002, she and Christopher argued because he was again criticizing her parenting skills and religious beliefs. Kimberly stated that "he at some point in the argument said to me have I ever called you the N-word and I must think that he was my white

boy bitch." She then swore at Christopher, took a lapel tie from her shirt, and in frustration threw the tie at the bed that Christopher was sitting on, but the tie did not hit him.

Kimberly explained her position as to the medicine for Kira's eyes following her birth. Kimberly testified that through her medical training, she was aware that antibiotics are given to babies to prevent eye infections due to sexually transmitted diseases. To her knowledge, Kimberly did not have a sexually transmitted disease at the time of Kira's birth.

Kimberly also explained her position as to Kira's immunizations. Kimberly agreed to immunize Kira, but wanted to have her immunizations done one by one so that if there was an adverse reaction to one of the shots, she would be able to tell which one caused the reaction.

Kimberly recounted the time that Christopher found her in the closet. According to Kimberly, she was not sleeping. She had just argued with Christopher over how to treat Kira for a cold. Kimberly wanted to place Kira in the shower, while Christopher wanted to bring in a humidifier. Kimberly was very upset that Christopher discounted her idea, and she started crying. When Christopher's mother, sister, and brother-in-law brought a humidifier to the apartment, Kimberly went into the closet because she did not want them to hear her crying.

Kimberly testified that Christopher demanded that she leave the apartment while he spent time with Kira. When she would not agree, he began taking Kira to his West Chicago home to spend time with her. Christopher also frequently made medical appointments for Kira at times that he knew Kimberly would not be available. Christopher would then criticize Kimberly for not being able to attend Kira's doctor visits. Christopher changed Kira's doctor without consulting Kimberly.

Kimberly is concerned that when she comes to pick up Kira at the West Chicago residence, Christopher makes her come to the back door. Kimberly feels that Kira may be getting the message that her mother is not worthy of coming to the front door.

Kimberly testified that she wants Kira to be exposed to different cultures, languages, religions, and ways of thinking. Kimberly wants Kira to be able to travel so that she is exposed to different families and experiences. Kimberly testified that she "wants the world for Kira" and not a "straight and narrow path." Kimberly testified that when she and Kira spend time together, they dance and sing. Kimberly has enrolled Kira in tumbling class. Kimberly wants to enroll Kira in classes to learn ballet and a musical instrument. Kimberly attends an African-American dance class and has taken Kira to that class on occasion. Kira enjoys dancing with the women and children at the African-American dance class.

Kimberly believes that she can teach Kira a lot about African-American culture, including African-American expressions, the African-American way of moving, African-American celebrations, and African-American family relationships. Kimberly also wants to help Kira learn to cope with being a woman of color.

Kimberly explained that she is reluctant to send Kira to a parochial school. Kimberly believes that it will be too limiting for Kira. Kira will have to wear a uniform and will not be able to wear jewelry other than that which is religious. Furthermore, Kimberly is skeptical that Kira will receive what she needs from a parochial school if she is gifted or for any reason is in need of special attention.

Kimberly testified that Kira has a close relationship with Che. Kira and Che play together. Che reads to Kira. Kira enjoys practicing Tae Kwan Do with Che. Kira turns the pages for Che when he practices the trumpet.

Kimberly testified that she attempts to encourage and facilitate a close relationship between Christopher and Kira. She encourages Christopher to have time alone with Kira. When Kimberly and Christopher were still living together, she would stand next to Christopher so that Kira would be

comfortable while he fed and bathed Kira. Kimberly provided Christopher with breast milk to feed Kira. She leaves lists for Christopher regarding what Kira has eaten and when Kira has napped. Kimberly asks Christopher about his availability before making doctor appointments for Kira. Kimberly has committed to staying in the Chicago area because she believes that it is important for Kira to have a relationship with her father.

2. Dr. Thomas

Dr. Anita Thomas, a psychologist retained by Kimberly, was called to the stand as an expert witness. During voir dire, Dr. Thomas testified that she is an associate professor at Northeastern Illinois University. Dr. Thomas teaches multicultural counseling, family counseling, child development, human development, professional identity, and ethics. In addition to her professorship, Dr. Thomas is engaged in private practice as a licensed clinical psychologist. Dr. Thomas counsels individuals, couples, and families.

Dr. Thomas has a Ph.D. in psychology, which she obtained from Loyola University in Chicago in 1995. Dr. Thomas specialized in multicultural counseling and family therapy. Dr. Thomas prepared a dissertation on the racial socialization of African-American families. Prior to her Ph.D., Dr. Thomas obtained a master's degree in community counseling from Loyola in 1992. To obtain this degree, she prepared a thesis on the emotional reactions of children in stepfamilies.

Dr. Thomas has published 17 articles, including several concerning African-American women and children. Dr. Thomas has presented 14 papers and 48 workshops, many of which dealt with understanding African-American culture and African-American families. Dr. Thomas has had extensive clinical training in interpreting MMPI-2 scores and significant experience in administering the MMPI-2 as part of psychological evaluations of children, adolescents, and adults. Dr. Thomas

has twice reviewed test results that other psychologists have administered and scored. Dr. Thomas admitted, however, that she has never before testified as an expert witness.

Following the above testimony, the trial court found that Dr. Thomas was qualified as an expert to render opinions only on the methodologies used by Dr. Hynan and Dr. Hatcher. The trial court did not qualify Dr. Thomas to render an opinion as to which parent Kira should be placed with. Although Christopher's attorney objected to the qualification of Dr. Thomas as an expert, when the trial court asked if he wanted a <u>Frye</u> hearing regarding any of Dr. Thomas's respective opinions, Christopher's attorney responded that he did not.

Dr. Thomas testified that there were several cultural concerns that should have been taken into account in evaluating which parent Kira should be placed with. She noted that Kimberly is African-American and Christopher is Caucasian. Dr. Thomas testified that African-Americans are traditionally defined by nine cultural variables: "communalism," or connectedness; harmony; spirituality; "verve," or spontaneity of expression; movement; oral tradition; social time perspective; and expressive individualism. According to Dr. Thomas, several of these variables are important in this case.

First, as to communalism, African-Americans have "fictive kinships," which are comprised of extended family, friends, and members of the community. In consultations, Kimberly indicated that she was extremely close to her family and that relocation to the Chicago area served as a significant loss of social support for her. The fact that Kimberly is willing to remain in the area demonstrates her commitment to co-parenting with Christopher.

Second, as to "verve," many African-American women find comfort in spontaneity and freedom of expression. This may be seen negatively within the larger community, as it is often mistaken for impulsivity or recklessness. African-American women generally face a stereotype of

being dominant, rebellious, aggressive, rude, loud, and even sexually promiscuous. Consequently, expressions of anger in African-American women are often seen as more intense or threatening than they actually are. African-American women typically cope with this by repressing feelings.

Dr. Thomas testified that one should not rely on the written psychological test scores without considering other corroborating evidence. Scores should be interpreted in light of cultural variables and other outside sources of information, such as the fact that Kimberly was living with Christopher in a strained relationship. If indeed Dr. Hynan and Dr. Hatcher failed to consider the cultural variables and other sources of information, their findings may be erroneous.

Dr. Thomas opined that the trial court should take into account Kira's biracial status. In Dr. Thomas's opinion, it is vitally important that Kira be socialized in the African-American culture. Less attention needs to be paid to the socialization of Kira's Caucasian identity, since mainstream culture reflects Caucasian values. In Dr. Thomas's opinion, Kira would get a better sense of her racial identity from living with Kimberly.

Dr. Thomas also opined that Kimberly's ideals concerning health care are more widely accepted than Dr. Hatcher's and Dr. Hynan's evaluations indicate. Dr. Thomas does not believe that Dr. Hatcher's and Dr. Hynan's evaluations provided any concrete evidence against Kimberly's parenting skills. In Dr. Thomas's opinion, Kira would benefit from exposure to different religious practices, which Kimberly plans to provide, because those who are exposed to multiple religious practices have a better sense of their own spirituality as they grow older.

### 3. Dr. Alexander

Dr. Charles Larson Alexander, a psychologist retained by Kimberly, was called to the stand. During voir dire, Dr. Alexander testified that he was a professor at the Illinois School of Professional Psychology, where he earned his doctorate degree in clinical psychology in 1998. Dr. Alexander

teaches courses in community mental health, social-psyche indifference, and treatment issues with diverse populations. Dr. Alexander also has a small private practice. Additionally, Dr. Alexander supervises a clinical research project that is a joint venture between Kids United, a nonprofit association, and the Cook County State's Attorney's office. The goal of the research project is to determine the effectiveness of multi-systemic therapy in the treatment of juvenile sex offenders.

Dr. Alexander has performed custody evaluations on three prior occasions. He testified in court in connection with one of those custody disputes and was found to be an expert. Dr. Alexander has administered and scored the MMPI-2 test numerous times. Dr. Alexander frequently reviews other clinicians' interpretations of the MMPI-2, in the course of his research project. Following the above testimony, the trial court found Dr. Alexander qualified to render expert testimony consistent with opinions disclosed in his written report.

Dr. Alexander testified regarding his report, in which he concluded that Dr. Hynan's and Dr. Hatcher's evaluations were suspect. In reaching this conclusion, Dr. Alexander explained that the mild level of guardedness that Dr. Hynan and Dr. Hatcher observed from Kimberly was not unusual. Rather, it is to be expected within the context of a custody evaluation, due to a parent's desire not to adversely impact how others may perceive him or her. Dr. Alexander pointed out that Dr. Hynan and Dr. Hatcher were far more forgiving with Christopher's guardedness than they were with Kimberly's guardedness.

Furthermore, Dr. Alexander explained that Kimberly's elevation on the four scale of the MMPI-2 was also not unusual and did not necessarily mean that Kimberly had impulsivity or self-control problems. According to Dr. Alexander, African-Americans tend to produce an elevated four scale, given the history and present status of racial and power dynamics in this country. Kimberly's

elevated four scale could actually be an indication of strength, not weakness. Additionally, the fact that Kimberly was in an unhappy and unfulfilling marriage could explain the elevated score.

Dr. Alexander opined that Kimberly's test scores should have been reconciled with her social background and the context within which the test was given. The scores also should have been corroborated with other outside information, such as Dr. Hynan's and Dr. Hatcher's impressions of Kimberly and reports from significant others. Without any corroborating outside information, Dr. Hynan's and Dr. Hatcher's determinations that Kimberly has significant personality traits are speculative.

### 4. Linda Dorsey

Linda Dorsey, Kimberly's sister from Decatur, Georgia, testified that Kira and Kimberly have a warm and engaged relationship. Kira is very attached to Kimberly. Kimberly and Kira talk, sing, read stories, and frequently laugh. Kimberly breast-feeds Kira, bathes her, and prepares her for naps and bed. Kimberly is patient with Kira. Che and Kira have a good relationship. Kira and Che are very glad when they get to see each other. Kira and Che like to play hide and seek. Che and Kira sing and dance together. Linda has never seen Che act aggressively toward Kira. Kira always wants to be near Che and frequently asks for "Che Che."

### 5. Dr. Schulman

Dr. Larry Schulman, a licensed clinical social worker, testified that he treated Che in North Carolina. Che is not a danger to himself or anyone else. Che does not have any major psychiatric problems and does not meet the criteria for learning or behavior disorders. Che has a loving relationship with Kira.

### 6. Donna Stevens

Donna Stevens testified that she was a third-grade teacher at Beebe School in the Naperville Community School District. Donna is Che's teacher. According to Donna, Che is intelligent, inquisitive, thoughtful and understanding. Che has never shown aggression toward any of the other students. If Che notices that another student in the class is in need of help, he helps him or her. If Che notices another student being left out, he tries to include him or her. Che typically receives average grades.

### 7. Kate Evans

Kate Evans testified that she is a therapist at the Western Suburbs YMCA. Kate also helps with child care for women going to group therapy on Thursday night. Kimberly attends the Thursday night group and sometimes uses the YMCA child care services for Kira and Che. When Kimberly drops the children off, she makes sure the kids are settled and is sure to tell the kids that she will be done in an hour and a half. Kira and Che play together and are very fond of each other. When Kira gets anxious, Che will hold her. Che interacts well with the other children at the YMCA and seems to make friends quickly.

### 8. Marianne Cook

Marianne Cook testified that her son Joseph attends school with Che. On the first day of school, Joseph was nervous. Che walked up to Joseph and put his arm around him. Che and Joseph became friends and have played together at each other's homes several times. Marianne has never seen Che misbehave.

### C. Christopher's Rebuttal

### 1. Dr. Hynan

Dr. Hynan testified regarding a report he compiled in rebuttal to Dr. Thomas's and Dr. Alexander's opinions. Dr. Hynan agreed that cultural factors need to be considered in determining

custody, including the fact that Kimberly is African-American and the fact that Christopher is Caucasian. Additionally, Dr. Hynan agreed that cultural differences need to be considered in interpreting the MMPI-2 test results. Dr. Hynan opined that there have been "different findings in different specific studies" relating to racial differences in MMPI-2 scores. In some studies, on some scales, African-Americans have higher scores, and in other studues, on some scales, Caucasians have higher scores. Dr. Hynan opined that the differences that do exist tend to be small and not of clinical significance. Dr. Hynan believed that Kimberly's elevations were too significant to be attributed to the fact that she is an African-American woman.

### 2. Dr. Hatcher

Dr. Hatcher testified regarding a report that he compiled in rebuttal to Dr. Thomas's and Dr. Alexander's opinions. Dr. Hatcher testified that he believed that ethnicity and racial criteria should be considered in determining custody. Dr. Hatcher also testified that there was evidence in his field that African-American women have a slight tendency to score higher on scales that measure defensiveness. Dr. Hatcher was aware of such evidence when he scored Kimberly's test results, but from his personal observations of Kimberly, he believed that the elevations had significance. Dr. Hatcher believed that Kimberly presented herself to be nonconventional and somewhat rebellious in her attitude, especially toward authority figures.

### D. The Trial Court's Decision

On September 1, 2005, the trial court entered a judgment for dissolution, in which it granted Kimberly sole custody of Kira and granted Christopher visitation with Kira. In its August 25, 2005, memorandum opinion, the trial court prefaced the reasons for its determination by stating that awarding Kimberly sole custody had been a difficult decision. The trial court did not believe that Kira would be in physical or emotional danger if placed with either parent, as both parents were

good, decent, and honorable people. However, because of their inability to effectively co-parent, the trial court applied the statutory factors in assessing the respective claims for sole custody.

The trial court first considered the respective wishes of Christopher and Kimberly. With regard to this factor, the trial court found that both Christopher's and Kimberly's requests were well-founded and well-intended.

The trial court next considered the wishes of Kira. The trial court found that because Kira was only two, she could not express with which parent she desired to live. The trial court noted, however, that by the accounts of all the witnesses, Kira loves both parents and is happy spending time with each of them.

Third, as to the interaction of Kira with her parents and sibling and other significant persons, the trial court found that Kira has a loving relationship with each parent. Kira also has a loving relationship with her brother Che. The trial court noted that Kira loves her grandparents, uncles, aunts, and cousins.

Fourth, as to Kira's adjustment to her home, school, and community, the trial court found no indication that Kira has any difficulty in her father's home or her mother's home. Any difficulty that Kira experiences stems from the uncertainty that has flowed from the custody conflict.

The fifth factor considered by the trial court was the mental and physical health of all parties involved. The trial court found that neither Christopher nor Kimberly suffer from any mental or physical maladies that would preclude them from parenting Kira. To the extent that either parent had any elevations on psychological tests administered to them, the court found the elevations insignificant. The trial court noted that although each parent has a very different outlook on what is best for Kira, neither Christopher's nor Kimberly's parenting approach is wrong.

The sixth and seventh factors considered by the trial court were physical violence or the threat thereof and the occurrence of ongoing abuse. The trial court found that there had been no violence by either party directed at the other. The trial court noted that any incidents of conflict had been merely verbal.

The final statutory factor considered by the trial court was the willingness and ability of each party to facilitate and encourage a close and continuing relationship between Kira and the other parent. With regard to this factor, the trial court stated as follows:

"Each party gave lip service to their willingness to do so, but there certainly have been problems doing so during the pendency of this case. The court finds those difficulties to have arisen out of the ongoing inability of the parties to be willing to compromise and communicate, not out of any inherent inability of either party to facilitate that relationship. The Court is aware that both Dr. Hynan and Dr. Hatcher have opined that it is in Kira's best interests that her custody be awarded to [Christopher], primarily, though not exclusively, based upon their opinion that he is the one most able to foster and encourage a close relationship with the other party. The Court has reviewed their written reports and listened closely to their testimony and concludes that the primary basis of that opinion was the pendency at the time they did their evaluation of a [p]etition then on file by [Kimberly] to remove Kira from the State of Illinois and relocate her to North Carolina. Each of those experts acknowledged that that factor weighed heavily in their opinion, and each acknowledged that the fact that the [p]etition has been withdrawn by [Kimberly] would affect the weight to be given to that factor in the basis of their opinions. As can be seen by a review of the above, this case is exceedingly close on the issue of custody. The only good news is that no matter which way the court comes down on the award of custody, the child

will be in good hands and will be properly cared for. The efforts by both parties to somehow portray the other as an unfit or uncaring parent has failed, in this Court's opinion. We are left with two loving, caring, and able parents who can't agree on what to do with their daughter."

The trial court also found the fact that Kira is a biracial child to be a relevant factor. The trial court clarified its consideration of Kira's heritage in stating that it did not believe in a "broad stroke" approach, that being that Kimberly should be awarded custody solely because she is African-American. However, the trial court did find that Kimberly would be able to provide Kira with a "breadth of cultural knowledge and experience that [Christopher] will not be able to do." The trial court noted that Kira would have to learn to exist as a biracial individual in a society that is sometimes hostile toward people of different races and that Kimberly would be better equipped to provide for this emotional need of Kira's.

The trial court granted Christopher extensive visitation with Kira. Christopher was to have visitation for a full week at a time on an alternating basis until Kira started school. Once Kira started school, Christopher would have visitation on Tuesdays and Thursdays and on alternating weekends and holidays. During summer breaks between school years, Christopher would resume visitation for a full week at a time on an alternating basis.

Following the trial court's entry of the above judgment for dissolution, Christopher filed a timely notice of appeal.

## II. DISCUSSION

On appeal, Christopher contends that the trial court erred in awarding custody of Kira to Kimberly. Christopher's arguments against the trial court's custody determination are essentially twofold. Christopher first argues that the trial court erred in admitting Dr. Thomas's expert

testimony. Christopher next contends that the trial court's determination was against the manifest weight of the evidence.

## A. The Admission of Dr. Thomas's Testimony

Christopher's first argument concerns the admission of Dr. Thomas's testimony. In particular, Christopher argues that Dr. Thomas was unqualified and that her opinions were not based on theories generally accepted by the relevant scientific community.

The test for competency of an expert is whether the witness exhibits sufficient knowledge of the subject matter. In re Custody of Baty, 83 Ill. App. 3d 113, 115 1980 . For a witness to testify as an expert concerning an opinion, it must be demonstrated that the witness possesses special skills or knowledge beyond that of the average layperson. People v. Hernandez, 313 Ill. App. 3d 780, 784 2000 .

The opinion testimony of an expert is admissible if the expert is qualified by knowledge, skill, experience, training, or education in a field that has at least a modicum of reliability, and if the testimony would aid the trier of fact in understanding the evidence. Snelson v. Kamm, 204 Ill. 2d 1, 24 (2003); In re Marriage of Jawad, 326 Ill. App. 3d 141, 152 (2001). The determination of a witness's qualifications rests within the sound discretion of the trial judge and will not be reversed absent an abuse of that discretion. Snelson, 204 Ill. 2d at 24; In re K.T., 361 Ill. App. 3d 187, 202 2005 .

That said, an expert witness s opinion cannot be based upon mere conjecture and guess. Jawad, 326 Ill. App. 3d at 152. An expert s opinion is only as valid as the reasons for the opinion, and the trial court is not required to blindly accept the expert s assertion that his testimony has an adequate foundation. Turner v. Williams, 326 Ill. App. 3d 541, 552-53 2001 . Rather, the trial court must look behind the expert s conclusion and analyze the adequacy of the foundation. Soto v. Gaytan, 313 Ill. App. 3d 137, 146 2000 . Indeed, the trial court plays a critical role in excluding testimony that does not bear an adequate foundation of reliability. Soto, 313 Ill. App. 3d at 146.

Additionally, in determining whether an expert is qualified to render an opinion based on novel scientific evidence, Illinois follows the test set forth in Frye v. United States, 293 F. 1013 (D.C. Cir. 1923). See People v. Eyler, 133 Ill. 2d 173, 211 (1989). Under the standard articulated in Frye, the proponent of expert testimony predicated upon a scientific theory must establish that the theory has gained general acceptance in the expert's scientific field. Turner, 326 Ill. App. 3d at 554. In this context, "general acceptance" does not mean universal acceptance, and it does not require that the methodology in question be accepted by unanimity, consensus, or even a majority of experts. In re Commitment of Simons, 213 Ill. 2d 523, 530 (2004). Instead, it is sufficient that the underlying method used to generate an expert's opinion is reasonably relied upon by experts in the relevant field. Significantly, the Frye test applies only to "new" or "novel" scientific methodologies. Donaldson v. Central Illinois Public Service Co., 199 Ill. 2d 63, 78-79 (2002). Generally speaking, a scientific methodology is considered "new" or "novel" if it is "original or striking" or does "not resemble something formerly known or used." Donaldson, 199 Ill. 2d at 79, quoting Webster's Third New International Dictionary 1546 (1993).

In the case herein, the trial court did not abuse its discretion in qualifying Dr. Thomas to testify. The voir dire of Dr. Thomas was extensive and more than adequately demonstrated her expertise in psychological counseling and testing. Indeed, Dr. Thomas proved herself to be a very learned psychologist who has taught numerous classes on subjects including multicultural counseling, family counseling, child development, human development, and professional identity. Dr. Thomas has also completed and presented dozens of articles, papers, and seminars. Moreover, Dr. Thomas has had significant experience in administering the MMPI-2 test and in interpreting MMPI-2 scores. Dr. Thomas's knowledge, experience, education, and skill in the field of psychology undoubtedly aided the trier of fact in understanding the evaluations performed on Kimberly and Christopher by Dr. Hynan and Dr. Hatcher, the purpose for which her testimony was

admitted. It is important to note that the trial court did not find Dr. Thomas qualified to make a custody recommendation, but only to opine on the methods used by Dr. Hynan and Dr. Hatcher in evaluating Kimberly and Christopher. Dr. Thomas was certainly qualified to comment on the methodologies of Dr. Hynan and Dr. Hatcher. Furthermore, we do not believe that the admission of Dr. Thomas's testimony offended the principles espoused in Frye. Dr. Thomas's opinions were not based on new or novel methods. This is evident from the testimony of Dr. Alexander, which Christopher does not challenge and which the dissent barely mentions in its analysis. Dr. Alexander's testimony closely resembled Dr. Thomas's on many points. Like Dr. Thomas, Dr. Alexander believed that in scoring Kimberly's personality tests, Dr. Hynan and Dr. Hatcher should have taken into account outside information, such as the fact that Kimberly and Christopher were going through a divorce and custody dispute, and also cultural variables, such as the fact that Kimberly is African-American. Dr. Alexander agreed with Dr. Thomas that Kimberly's ethnicity could have caused some of her elevated scores. In his report, Dr. Alexander supported these opinions with citations to many learned treatises such as J.N. Butcher & K. Han, The Development of an MMPI-2 Scale to Assess the Presentation of Self in a Superlative Manner (1995), and D. Nichols, Essentials of MMPI-2 Assessment (2001).

Moreover, even Dr. Hynan and Dr. Hatcher acknowledged in their rebuttal reports that there was authority in their field that indicated that minorities tended to score higher on certain scales. Additionally, both Dr. Hynan and Dr. Hatcher acknowledged that race should be taken into consideration in scoring personality tests and in determining custody. However, despite the fact that both acknowledged that race was a pertinent factor, neither Dr. Hynan nor Dr. Hatcher believed that Kimberly's elevated scores were due to her being an African-American woman.

Finally, of particular significance is the fact that when the trial court asked Christopher if he wanted a <u>Frye</u> hearing regarding any of Dr. Thomas's opinions, Christopher, through his attorney, responded that he did not. The failure to request a <u>Frye</u> hearing is grounds to treat as waived any objections on review to the foundation of an expert's opinion. See <u>Snelson</u>, 204 Ill. 2d at 24-25.

We note that, in his brief, Christopher complains that Dr. Thomas's testimony exceeded the limited scope for which it was admitted, because she opined as to which parent should be granted custody of Kira. After closely reviewing Dr. Thomas's testimony and written report admitted into evidence, we do not believe that Dr. Thomas opined as to which parent should be given custody. However, portions of Dr. Thomas's testimony did slightly exceed the scope of the trial court's limitation. Dr. Thomas's testimony focused on three main areas: (1) cultural variables that commonly affect African-American women; (2) using these cultural variables to score personality tests; and (3) child development concerns such as health care, spirituality, and racial identity. Some of Dr. Thomas's testimony regarding child development did not concern the methodologies employed by Dr. Hynan and Dr. Hatcher, such as Dr. Thomas's testimony that Kimberly would be better able to foster Kira's racial identity. However, much of this testimony was elicited by Christopher during cross-examination and objected to by Kimberly. For example, the following colloquy can be found in the record:

"[CHRISTOPHER'S ATTORNEY]: When you said Mr. Gambla--do you believe Mr. Gambla couldn't give--excuse me. Kira won't get the racial identity that she needs if she lived predominantly with Mr. Gambla; is that correct?

DR. THOMAS: That is correct.

[CHRISTOPHER'S ATTORNEY]: And that . . .

DR. THOMAS: That is my opinion.

[CHRISTOPHER'S ATTORNEY]: And that's because society is going to give, on it's whole, give her more racial identity of being Caucasian than she will get from living society and getting a black identity. . .

[KIMBERLY'S ATTORNEY]: Objection.

THE [TRIAL] COURT: If you understand that question Doctor, you may answer it. Overruled.

DR. THOMAS: In a yes/no fashion?

THE [TRIAL] COURT: It was a yes/no question, if you can answer it that way.

DR. THOMAS: Can you repeat the question? I'm sorry.

[CHRISTOPHER'S ATTORNEY]: Do you believe that Kira would get a better sense of her--part of her racial identity from living with Ms. Woodson; correct?

DR. THOMAS: Yes.

[CHRISTOPHER'S ATTORNEY]: And you also believe that if she lived with Ms. Woodson, then she could get enough identity for being part Caucasian from society on--in itself?

DR. THOMAS: Yes, that's correct."

Kimberly can hardly be faulted for her expert's testimony exceeding the scope of the trial court's limitation when Christopher elicited such testimony over Kimberly's objection. See In re Kenneth D., 364 Ill. App. 3d 797, 803 (2006).

In sum, the trial court did not abuse its discretion in admitting Dr. Thomas's testimony. Dr. Thomas's testimony was not based on a novel or new scientific theory and did not offend Frye. Additionally, Christopher is not entitled to a reversal based on the fact that Dr. Thomas's testimony minimally exceeded the scope for which it was admitted, when he himself elicited such testimony.

B. The Sufficiency of the Evidence Supporting the Trial Court's Custody Determination

Christopher's next argument is that the trial court's custody determination was against the manifest weight of the evidence. Christopher argues that the trial court failed to consider all of the requisite statutory factors and improperly considered the fact that Kira is biracial.

In a custody dispute, the primary consideration is the best interest and welfare of the child. 750 ILCS 5/602 (West 2004). A decision regarding child custody will not be disturbed on appeal unless it is against the manifest weight of the evidence. In re Marriage of Petraitis, 263 Ill. App. 3d 1022, 1031 (1993). A judgment is against the manifest weight of the evidence when the opposite conclusion is apparent or when the findings appear to be unreasonable, arbitrary, or not based upon the evidence. In re Marriage of Karonis, 296 Ill. App. 3d 86, 88 1998 . In determining whether a judgment is contrary to the manifest weight of the evidence, the reviewing court views the evidence in the light most favorable to the appellee. In re Marriage of Divelbiss, 308 Ill. App. 3d 198, 206 (1999). Where the evidence permits multiple reasonable inferences, the reviewing court will accept those inferences that support the trial court s order. Divelbiss, 308 Ill. App. 3d at 206-07.

We will affirm the trial court s ruling if there is any basis to support the trial court s findings. Divelbiss, 308 Ill. App. 3d at 207. There is a strong and compelling presumption that the trial court, the entity closest to the litigation, has made the proper custody decision. In re Marriage of Diehl, 221 Ill. App. 3d 410, 424 1991 . The trial court s custody determination is afforded  great deference  because the trial court is at a superior vantage point to judge the credibility of the witnesses and determine the best interest of the child. In re Marriage of Bates, 212 Ill. 2d 489, 516 2004  Karonis, 296 Ill. App. 3d at 88. A custody determination inevitably rests on the parties' temperaments, personalities, and capabilities and the witnesses' demeanor. In re Marriage of Wolff, 355 Ill. App. 3d 403, 413 2005 .

Section 602(a) of the Illinois Marriage and Dissolution of Marriage Act (Act) (750 ILCS 5/602(a) (West 2004)) provides that the court shall consider all relevant factors, including: *1 the wishes of the child s parent or parents as to his custody 2 the wishes of the child as to his custodian 3 the interaction and interrelationship of the child with his parent or parents, his siblings and any other person who may significantly affect the child s best interest 4 the child s adjustment to his home, school and community 5 the mental and physical health of all individuals involved 6 the physical violence or threat of physical violence by the child s potential custodian, whether directed against the child or directed against another person 7 the occurrence of ongoing abuse and 8 the willingness and ability of each parent to facilitate and encourage a close and continuing relationship between the other parent and the child. 750 ILCS 5 602 a West 2004 . The factors enumerated in section 602 a are not exclusive. In re Marriage of Martins, 269 Ill. App. 3d 380, 389 1995 .*

*In the present case, the trial court conducted 15 days of trial, considered the testimony of 15 witnesses, and received into evidence and reviewed 128 exhibits, after which it carefully weighed each of the statutory factors. Based on those factors, the trial court found the parties to be equally qualified to care for Kira. As to the first factor, the trial court found that both Christopher and Kimberly desired sole custody of Kira and that their desires were well-intended.*

The trial court next considered the wishes of Kira and found that because Kira was only two years old, she could not express her feelings as to with which parent she desired to live. The trial court noted, however, that by the accounts of all the witnesses, Kira loves both parents and is happy spending time with each of them.

Third, as to the interaction of Kira with her parents, sibling, and other significant persons, the trial court found that Kira has a loving relationship with each parent, as well as with Che and her

grandparents, uncles, aunts, and cousins. This third factor is very significant here, as the evidence in this case reveals a close relationship between Kira and Che, who resides with Kimberly.

Fourth, as to Kira's adjustment to her home, school, and community, the trial court found no indication that Kira had any difficulty in her father's home or her mother's home. The trial court's findings with regard to these first four factors were fully supported by the parties' and their witnesses' testimony, which established that Kimberly and Christopher each were loving and capable of providing Kira with a stable home.

As to the fifth factor, the parties' mental and physical health, the trial court found that neither Christopher nor Kimberly suffered from any mental or physical maladies that would preclude them from parenting Kira. To the extent that either parent had any elevations on psychological tests administered to them, the court found the elevations insignificant. The evidence as to this factor was conflicting, but nonetheless supported the trial court's findings that both parents were on equal ground as to their mental and physical health. Dr. Hatcher and Dr. Hynan reported that Kimberly had some psychological difficulties. However, there was inconsistency in Dr. Hatcher's testimony, as he at one point described Kimberly's elevation as merely a "mild clinical elevation." Furthermore, Dr. Thomas and Dr. Alexander believed that Dr. Hatcher and Dr. Hynan may have failed to take into account pertinent outside factors in scoring Kimberly's personality tests. The trial court apparently found Dr. Hatcher's and Dr. Hynan's testimony to be slightly impeached, which the trial court was certainly entitled to do. It would be error to second-guess the trial court's findings here, as the trial court was in a superior position to judge the credibility of the witnesses. Bates, 212 Ill. 2d at 516; Karonis, 296 Ill. App. 3d at 88.

As to the sixth and seventh factors, the trial court found no evidence of physical violence or ongoing abuse. Although Christopher in his testimony alluded to some acts of physical violence by

Kimberly, the trial court found otherwise. Again, the trial court was in the best position to judge the credibility of the witnesses, and the trial court should not be second-guessed on this point. Bates, 212 Ill. 2d at 516; Karonis, 296 Ill. App. 3d at 88.

Finally, the trial court considered the willingness and ability of each party to facilitate and encourage a close and continuing relationship between Kira and the other parent. With regard to this factor, the trial court found that both parents needed improvement in this area. The trial court noted Dr. Hynan's and Dr. Hatcher's opinions that Christopher was more equipped than Kimberly to encourage a close relationship between Kira and her noncustodial parent. However, the trial court found that their opinions appeared to have been based in part on the fact that Kimberly was pursuing a removal petition. Because Kimberly had since changed her plans to move to North Carolina, the trial court found the parties equal on this factor. The trial court's inference that Dr. Hynan's and Dr. Hatcher's opinions were partly based on Kimberly's removal petition was a reasonable one. Dr. Hynan testified that Kimberly's removal petition had played a significant part in his evaluation. Additionally, Dr. Hatcher testified that he also had considered Kimberly's removal petition.

With the parties being equal as to all of the above statutory factors, the trial court looked to other relevant factors. One factor was the fact that Kira is both African-American and Caucasian and that, as an African-American woman, Kimberly could provide Kira with a "breadth of cultural knowledge" as to her African-American heritage. The trial court noted that Kira would have to learn to exist as a biracial woman in a society that is sometimes hostile to such individuals and that Kimberly would be better able to provide for Kira's emotional needs in this respect. The trial court believed that this factor tipped the scale slightly in Kimberly's favor, and it awarded Kimberly sole custody of Kira.

The dissent contends that racial status was an improper factor for the trial court to consider. The cold reality is that no one can put blindfolds on in this case. Christopher is Caucasian, Kimberly is African-American, and Kira is biracial. Illinois case law provides that race may be considered, but that it may not outweigh all of the other relevant factors. Even Christopher conceded as much during the oral arguments this court held. In Fountaine v. Fountaine, 9 Ill. App. 2d 482, 486 (1956), the Illinois Appellate Court, First District, reversed a custody determination where the trial court had awarded sole custody of the children to the African-American father over the Caucasian mother. The court in Fountaine reasoned that the trial court had made its decision based solely on the fact that the children bore predominantly African-American physical characteristics. Fountaine, 9 Ill. App. 2d at 484-85. The court further reasoned:

"In passing upon the question of how the interests and welfare of the children will be best served, the court can and should take into consideration all relevant considerations which might properly bear upon the problem. However, we do not believe that the question of race alone can overweigh all other considerations and be decisive of the question. [Citation.] If this was the sole and decisive consideration on which the trial court based his decision, and it so appears from the record before us, we feel that his discretion was not properly exercised ***." Fountaine, 9 Ill. App. 2d at 486.

Several other Illinois courts have applied the holding in Fountaine to slightly different sets of circumstances. See In re Custody of Russell, 80 Ill. App. 3d 41, 45 (1979); Langin v. Langin, 2 Ill. App. 3d 544, 547 (1971). For example, in Russell, the Appellate Court, Fifth District, reviewed a custody determination where the trial court had awarded custody of the parties' minor son to the father over the mother. Russell, 80 Ill. App. 3d at 44-45. In making its determination, the trial court had relied in part on the fact that the mother faced potential social problems due to her interracial

No. 2--05--0971

marriage to an African-American man. Russell, 80 Ill. App. 3d at 44. However, the trial court also considered a handful of other factors, such as the mother's emotional problems, the instability of the mother's marriage, and the fact that the mother did not have concrete child care plans in place. Russell, 80 Ill. App. 3d at 44. In affirming the trial court, the Russell court reasoned:

"We have no doubt, after reviewing the record, that the court took into consideration all relevant factors and did not allow the matter of race alone to overweigh all other considerations and did not regard the racial factor as decisive. [Citations.] Instead, the court simply acknowledged that social pressures could develop that would be difficult or detrimental for [the child]." Russell, 80 Ill. App. 3d at 45.

Illinois case law is in line with a United States Supreme Court case, Palmore v. Sidoti, 466 U.S. 429, 80 L. Ed. 2d 421, 104 S. Ct. 1879, 1984 . In Palmore, the Supreme Court reviewed an award of custody of a Caucasian child to the Caucasian father over the Caucasian mother, who had remarried an African-American man. Palmore, 466 U.S. at 431-32, 80 L. Ed. 2d at 425, 104 S. Ct. at 1881. The Supreme Court determined that the custody award was unconstitutional, not because the trial court considered race, but because the trial court considered solely race. Palmore, 466 U.S. at 432, 80 L. Ed. 2d at 425, 104 S. Ct. at 1881. Indeed, the Supreme Court was careful to premise its holding with the following statement But that court was entirely candid and made no effort to place its holding on any ground other than race. Palmore, 466 U.S. at 432, 80 L. Ed. 2d at 425, 104 S. Ct. at 1881.

Volumes of cases from other jurisdictions have interpreted Palmore as not prohibiting the consideration of race in matters of child custody. See, e.g., J.H.H. v. O'Hara, 878 F.2d 240, 245 8th Cir. 1989 declining to read Palmore as a broad proscription against the consideration of race in matters of child custody Drummond v. Fulton County Department of Family & Children Services, 563 F.2d

˘36˘

1200, 1204-06 (5th Cir.1977) *en banc* (*determining that use of race as merely one factor in making adoption decisions is constitutional*), *cert. denied*, 437 U.S. 910, 57 L. Ed. 2d 1141, 98 S. Ct. 3103 (1978); Tallman v. Tabor, 859 F. Supp. 1078 (E.D. Mich. 1994) (holding that race can be considered in determining custody so long as race is not the sole consideration); In re Davis, 502 Pa. 110, 125-39, 465 A.2d 614, 621-29 (1983) (holding that trial court should have considered *race as a factor in making foster placement decision*); Farmer v. Farmer, 109 Misc. 2d 137, , 439 N.Y.S. 2d 584, 588 (1981) (*stating that "the general rule appears to be that race is simply one factor among many others which should be considered in determining* what is in the child's best interest"). Indeed, it appears that so long as *race is not the sole consideration for custody decisions, but only one of several factors, it is not an unconstitutional consideration. The dissent grossly misinterprets the holding of* Palmore *and ignores its progeny.*

*In this case,* Kira's *racial status did play a role in the trial court's decision to award custody to* Kimberly. *However, contrary to the dissent's contention, it was not the sole factor. In fact, the dissent unfairly characterizes the trial court's opinion as insinuating "that only an* African-American *person can properly raise a biracial child in this society."* Slip op. *at* 50. *There were many components besides race that factored into the trial court's decision.*

*The trial court heard evidence from* Kimberly *as to how* she would teach Kira about African-American culture. In particular, Kimberly hoped to teach Kira about African-American expressions, the African-American way of moving, African-American celebrations, and African-American family relationships. Kimberly also wanted to teach Kira how to cope with being a woman of color. *However, the ability to provide* Kira *with an atmosphere rich in traditions from her* African-American *heritage was not the sole factor nor the primary factor considered by the trial court. In fact, the trial court stated that it* did not believe in a "broad stroke" approach that would award custody to Kimberly solely because

she is African-American. The trial court carefully considered and appropriately weighed the eight requisite statutory factors, along with Kira's cultural background. As such, there is no basis in the record to determine that the trial court's custody determination was against the manifest weight of the evidence. It is obvious from the manner in which the trial court painstakingly laid out all of its reasons for awarding custody of Kira to Kimberly that this was a very difficult decision for the trial court. There was evidence in favor of Kimberly being granted custody and evidence in favor of Christopher being granted custody.

Christopher complains that the trial court did not give enough credence to the opinions of Dr. Hynan and Dr. Hatcher, the only two experts qualified to give opinions as to which parent should be awarded custody. However, it is well-settled law that it is the trial judge, not the expert witness, who is the trier of fact. See Cerveny v. American Family Insurance Co., 255 Ill. App. 3d 399, 407 (1993); People v. Columbo, 118 Ill. App. 3d 882, 938 (1983). The trier of fact is not bound to accept the opinion of an expert on an ultimate issue (In re J.H., 153 Ill. App. 3d 616, 631 (1987); Piano v. Davison, 157 Ill. App. 3d 649, 675 (1987)), which in this case is which parent should be awarded custody of Kira. Prohibiting a trier of fact from rejecting an expert's opinion on an ultimate issue would usurp the role of the trier of fact. People v. Campos, 227 Ill. App. 3d 434, 448 (1992).

The only recognized exception to the above rule applies when the expert's testimony pertains to "issues 'beyond the understanding of a lay person,' " such as medical testimony in a medical malpractice case. Morus v. Kapusta, 339 Ill. App. 3d 483, 492 (2003), quoting Davison, 157 Ill. App. 3d at 675. Certainly, deciding what is in the best interest of a child is within the average understanding of a lay person. Although expert testimony may be helpful to the trial court in

determining which parent should get custody, it is not required. The trial court is perfectly capable of weighing the appropriate factors and making this determination on its own.

Our Illinois Supreme Court has eloquently explained the role of the trial court:

"The weight accorded expert testimony must be decided by the trier of fact. [Citation.] Even if several competent experts concur in their opinion and no opposing expert testimony is offered, it is still within the province of the trier of fact to weigh the credibility of the expert evidence and to decide the issue. [Citation.] However, the uncontradicted and unimpeached opinion of an expert cannot be rejected arbitrarily. [Citations.] An opinion of an expert is to be accorded such weight that, in light of all of the facts and circumstances of the case, reasonably attaches to it. [Citation.]" In re Glenville, 139 Ill. 2d 242, 251 (1990).

The dissent charges the trial court with "incorrectly disregard[ing] the notable expertise" of Dr. Hynan and Dr. Hatcher. Slip op. at 48. The dissent fails to understand the role of the trier of fact. The trial court here was not bound to accept Dr. Hynan's and Dr. Hatcher's opinions on which parent should be awarded custody of Kira. To require the trial court to do so would virtually eliminate the trial court's responsibility. The record reveals that the trial court did afford consideration to Dr. Hynan's and Dr. Hatcher's opinions. However, after giving Dr. Hynan's and Dr. Hatcher's opinions due consideration, the trial court was free to reject them or place little weight on them in light of other evidence. Much of Dr. Hynan's and Dr. Hatcher's testimony was called into question. Both Dr. Thomas and Dr. Alexander disagreed with Dr. Hynan's and Dr. Hatcher's methods in scoring Kimberly's personality tests. Additionally, Dr. Thomas disagreed with Dr. Hynan's and Dr. Hatcher's concerns about Kimberly's preference for nonconventional health care. Finally, Dr. Hynan's and Dr. Hatcher's opinions that Christopher would be the better parent to foster a relationship with the other parent was controverted by Kimberly's testimony that she believes that

it is important for Kira to have a relationship with Christopher. Kimberly demonstrated her belief by withdrawing her removal petition and moving her mother to Illinois. Notably, Christopher never testified as to his desire to promote a relationship between Kira and Kimberly.

Finally, the dissent criticizes this decision, claiming it is based on a slanted presentation of "pseudo-facts" and speculation. Slip op. at 52. However, none of the facts that the dissent recites as being overlooked would merit a different result. This opinion is clearly replete with pages of facts that favor both sides. Obviously, not every single iota of testimony can be included in this decision. Furthermore, any "speculations" (slip op. at 52) that the dissent refers to are actually logical inferences drawn from facts recited.

### III. CONCLUSION

The evidence in this case was closely balanced and the decision to award custody of Kira to Kimberly was no doubt a very difficult one for the trial court. Oftentimes the trial court is left with having to choose between two less than desirable parents. But in this case, the trial court was faced with two good parents, each of whom is capable of raising Kira. The collective testimony and exhibits depict Kimberly and Christopher almost evenly. After sifting through the relevant factors, however, the trial court found that Kimberly was the parent who could ever so slightly better contribute to Kira's overall well-being. Giving the trial court due deference, a reasonable person cannot possibly find that the trial court's custody determination is against the manifest weight of the evidence. As such, we must affirm the custody determination of the trial court.

For the foregoing reasons, the judgment of the circuit court of Du Page County is affirmed.

Affirmed.

JUSTICE BYRNE, specially concurring:

I agree with the conclusion reached in the opinion of the court; however, my road to that end is different to such a degree that I feel compelled to express why I believe that the trial court's judgment should be affirmed.

In reaching its conclusion, this court accepts Dr. Thomas's conclusion that the mother should have custody. I believe that the court's acceptance of Dr. Thomas's opinion is improper. Dr. Thomas was one of four expert witnesses certified by the trial court. Of these four witnesses who were certified to give opinions in the case, one, Dr. Hynan, was the court's neutral witness; the other three expert witnesses, Drs. Alexander, Hatcher, and Thomas, were controlled experts chosen by the mother. Although the trial court found Dr. Thomas qualified to render her opinion concerning the testing methods employed as applied to African-Americans, it found her not qualified to offer an opinion concerning custody.

Drs. Hynan and Hatcher performed the tests on each of the parties and concluded that the father was the preferred custodian. Their opinions were in large part based on the results of these tests. Dr. Thomas, as well as Dr. Alexander, criticized the testing methods employed by Drs. Hynan and Hatcher and questioned the accuracy of the results. Both Drs. Thomas and Alexander were critical of the testing process because they stated that the tests, as given and interpreted, were probably not accurate as applied to African-Americans, who require analyses different from those used by Drs. Hynan and Hatcher. Further, the bulk of Dr. Thomas's testimony concerned the subject of race. While the trial court found her not qualified to render an opinion concerning custody, she nevertheless came to the conclusion that the mother should have custody because the child is biracial and a female. Because her conclusion as to custody was not admissible at trial, I believe that the majority had no right to accept it in affirming the trial court's judgment.

I note also that, aside from Dr. Thomas's opinion regarding custody, there was no competent expert witness opinion that the mother should have the child. Dr. Alexander never rendered an opinion as to who should have custody, although he was qualified to express an opinion, and Drs. Hynan and Hatcher favored the father.

If I thought that the trial court based its conclusion as to custody in any manner as espoused by Dr. Thomas, I would not support that result. As the dissent states, it has long been the law that custody based solely on race is an impermissible exercise of the court's discretion. See Fountaine v. Fountaine, 9 Ill. App. 2d 482, 486 (1956). I agree with the dissent that, had the court used race as the sole consideration in its analysis, it would have erred. However, I do not think race was the sole factor here.

This court cites In re Glenville 139 Ill. 2d 242 (1990), for the proposition that the trial court is free to determine the weight to be given to expert testimony. I believe that the trial court gave little weight to the expert conclusions of Drs. Hynan and Hatcher as to who should have custody, based on Drs. Thomas's and Alexander's criticism of their testing methods and analyses. The court then analyzed the myriad of nonexpert testimony offered by both parties consistent with the requirements of the statute (see 750 ILCS 5/602(a) (West 2004)), and found that a preponderance of the evidence favored the mother.

This was a long and complicated trial with many witnesses. The trial judge's memorandum opinion expressed the difficulty he had in arriving at a decision in a case as close as this one, where there were so many positives for each parent and, aside from certain eccentricities, no real negatives. While I support the result reached by this court, I do so for my own reasons. I hope that the parties will be able to work together to raise their daughter, both contributing their special heritages and personalities to the best of their abilities.

JUSTICE McLAREN, dissenting:

I respectfully dissent, because I am of the opinion that this court's disposition does not accurately reflect the facts contained in the record. I disagree with numerous portions of the court's opinion, as to both the facts reported and its conclusions of law. The court's recitation of facts is slanted toward the proposition that Kimberly should have been awarded custody, by including only the facts that support its conclusion. Despite the expansive statement of the facts in the court's opinion, it does not contain all of the facts necessary for a fair and impartial review of the trial court's judgment.

This dissent will focus on the trial court's fundamental errors, while commenting on a few of this court's errors.

TRIAL COURT'S ERRORS

The trial court's rulings concern mixed issues of law and fact. A mixed question of law and fact is reviewed under the clearly erroneous standard. Knorst v. State Universities Civil Service System, 325 Ill. App. 3d 858, 861 (2001). The clearly erroneous standard of review lies between the manifest weight of the evidence standard and the de novo standard and, as such, it grants some deference to the decision. AFM Messenger Service, Inc. v. Department of Employment Security, 198 Ill. 2d 380, 392 (2001). "[W]hen the decision *** [is of] a mixed question of law and fact, the *** decision will be deemed 'clearly erroneous' only where the reviewing court, on the entire record, is 'left with the definite and firm conviction that a mistake has been committed.' " AFM Messenger, 198 Ill. 2d at 395, quoting United States v. United States Gypsum Co., 333 U.S. 364, 395, 92 L. Ed. 746, 766, 68 S. Ct. 525, 542 (1948); see Moss v. Department of Employment Security, 357 Ill. App. 3d 980, 984-85 (2005); Quinlan v. Stouffe, 355 Ill. App. 3d 830, 836 (2005).

A court generally seeks an expert's opinion to assist it in making a custody determination, and a court cannot disregard medical testimony that is not countervailed by other competent testimony. In re Violetta B., 210 Ill. App. 3d 521, 535 (1991). The trial court cannot second-guess an expert's opinion, without basis. To do so would be contrary to the evidence before the court. The best interest of the child is the paramount consideration, and qualified and competent medical testimony concerning the child for whom the custody decision is being made must not be disregarded when determining what is in that child's best interest. In re C.B., 248 Ill. App. 3d 168, 179 (1993). Both Dr. Hynan and Dr. Hatcher, who were certainly experts qualified to opine as to the best interest of Kira, did render opinions regarding the health, and possible medical, concerns for Kira if Kimberly were to be awarded custody. Both experts recommended that Christopher be awarded custody of Kira, without condition or similar concerns for Kira if Christopher had custody.

It is important to know that Dr. Hynan and Dr. Hatcher rendered specific opinions as to why Kimberly should not be awarded sole custody. They could not have been more clear. As a result of their testing, interviews, and consideration of a plethora of professional factors, both doctors offered similar reasons for their opinions that Christopher be awarded custody. Both doctors recited their concerns with Kimberly's ability to fully and properly attend to Kira's mental and physical needs, including possible medical needs, because of Kimberly's particular personality type, which included impulsivity, narcissism, difficulties with authority, and problems with frustration tolerance. Both doctors questioned Kimberly's ability to openly promote the relationship between Kira and Christopher. Neither doctor found any significant concerns about Christopher. (Also, this court fails to mention that Dr.

Hynan was concerned with the effect that Che, Kira's half brother, might have on Kira because of Che's reported psychological difficulties, including the report of Che's threatened suicide.)

Evidence of the erroneous findings first comes to light by a review of the trial court's opinion letter. The trial court's six-page letter of opinion sets forth reasons for disregarding the opinions of both its own expert witness, Dr. Hynan, and Kimberly's chosen expert witness, Dr. Hatcher.

"The Court has reviewed their [Drs. Hynan's and Hatcher's] written reports and listened closely to their testimony and concludes that the primary basis of that opinion was the pendency at the time they did their evaluation[s] of a Petition then on file by [Kimberly] to remove Kira from the State of Illinois and relocate her to North Carolina. Each of those experts acknowledged that that factor weighed heavily in [his] opinion, and each acknowledged that the fact that the Petition has been withdrawn by [Kimberly] would affect the weight to be given to that factor in the basis of their opinions."

However, the record clearly indicates that the trial judge was incorrect when he wrote that critical portion of his opinion letter. The report of proceedings indicates that at the close of the first day of Dr. Hynan's testimony, the trial court itself asked Dr. Hynan: "Dr. Hynan, would your opinion relative to custody be any different had removal not been an area that you looked into at the time that you did your evaluation?" Dr. Hynan answered: "It would not be any different." Similarly, the report of proceedings from another trial day indicates that Dr. Hatcher was asked by Christopher's attorney: "Did your opinion rest in any part on the issue of removal?" Dr. Hatcher answered: "No. The issue had been

settled." This testimony alone illustrates that the trial court's ultimate custody decision was mistaken, when reviewed under the clearly erroneous standard, because the court incorrectly weighed the testimony by incorrectly factoring nonexistent impeachment of the reasons for the doctors' custody opinions. This court's opinion inexplicably fails to consider the trial court's improper factoring, and it compounds the problem because it relies upon the trial court's erroneous statements in affirming the judgment.

There is substantial material and unimpeached evidence in the record to rebut the assertion that Dr. Hynan's and Dr. Hatcher's custody opinions and recommendations favoring Christopher were based "primarily" upon Kimberly's removal petition. Dr. Hynan's December 3, 2004, seven-page, single-spaced rebuttal report, done at the court's request, is replete with specific reasons, information, test result comments, and an item-by-item rebuttal to the assertions and opinions of Dr. Alexander and Dr. Thomas. Notably, the report concludes with Dr. Hynan's remarks that the recommendation in his February 19, 2004, report, which recommended that custody be awarded to Christopher, "[does] not change at all after a review of [Drs. Alexander's and Thomas's] reports." Both of Dr. Hynan's reports contain extensive, specific details supporting his custody opinion. Consistent with the record, Dr. Hynan's two written reports dispel the conclusion that Dr. Hynan based his custody opinion primarily or solely upon Kimberly's removal petition. Both Drs. Hynan and Hatcher stated that the removal petition was indicative of the likelihood that Kimberly would not foster a strong relationship between Christopher and Kira, but was not the sole basis for their custody opinions.

Dr. Hatcher's rebuttal report, also done at the request of the court, supported his original custody opinion that Christopher should be awarded custody of Kira, and it

responded to the reports of Drs. Alexander and Thomas. A portion of the rebuttal report is representative of its contents.

"Dr. Thomas'[s] report essentially opined that I did not properly consider the psychological test results in light of the parties being involved in a custody evaluation, corroborative information regarding personality traits measured on the test, and the ethnicity of Kim Woodson. I disagree. I did, in fact, consider all of those factors in my deliberations and they helped form my opinion in the 604.5 custody report."

The importance and role of the local mandatory divorce evaluation rule, local court rules 15.18 (A)(1) and (2) (18th Judicial Cir. Ct. R.15.18(A)(1) and (2) (eff. March 1, 1998)), which had produced a professional custody opinion, was virtually cast aside by the court's ruling based upon an incorrect finding of fact.

It was error for the trial court to incorrectly disregard the notable expertise, exhaustive analysis, and extensive custody evaluation reports and testimony of Dr. Hatcher and Dr. Hynan and other evidence in the record in awarding Kira's custody to Kimberly.

In the trial court's opinion letter, the court said, "this case is exceedingly close on the issue of custody."

However, the court did not look to the extensive reports and testimony of its own custody expert witness or Kimberly's custody expert witness. Considering that the court determined that the case was exceedingly close and improperly discounted the substantial evidence of the expert's preference in favor of the father, it logically follows that a different result would have occurred if the trial court had not improperly discounted and failed to consider the expert evidence.

˘47˘

Additionally, the trial court erred in basing its custody award on race. If the trial court disregarded the opinions of Drs. Hynan and Hatcher, as it did, upon what information or opinions did the trial court rely? The only references to race were contained in the limited testimony of Dr. Alexander and Dr. Thomas. The court had limited the opinions of Dr. Alexander and Dr. Thomas to matters of impeachment of the other experts' testing techniques. The court stated that it would not consider their testimony relative to substantive custodial recommendations, because they had virtually no experience with child custody evaluations, custody opinions, or even the statutory guidelines for determining custody. Both those experts testified about the general effects of raising a child of color in this society, with Dr. Thomas's testimony being based primarily upon literature that she, herself, authored. Even though Dr. Alexander had not interviewed Christopher or Kira, he rendered an opinion (negatively) about Christopher anyway.

Both Drs. Alexander and Thomas offered only general critiques about the tests that Drs. Hynan and Hatcher had done. The criticisms amounted to inaccurate comments that Drs. Hynan and Hatcher should have considered the race and circumstances of the parties when they conducted their tests. Although the trial court barred Kimberly's two controlled witnesses from offering opinions about the best interest or custody of Kira, the court's letter of opinion clearly referenced and deferred to their testimony about Kimberly's greater ability to raise a biracial child. Immediately after stating that it would not use race as the determinative factor, as Dr. Alexander and Dr. Thomas suggested be done, the court, in the next sentence of the opinion letter, stated:

"However, it is true that [Kimberly] will be able, if awarded custody, to provide Kira with a breadth of cultural knowledge and experience that [Christopher] will not be

able to do.  Kira will have to learn to exist as a biracial individual in a community and society that is sometimes hostile to such an individual."

The following paragraph of the court's opinion letter states:

"The Court finds each of the parties to be fit and proper persons to be awarded her custody and to exercise full visitation and parenting rights but awards custody to [Kimberly] based on her slightly better ability to provide for the emotional needs of the child which may be occasioned by her special circumstances as discussed above [her ability to provide a breadth of cultural knowledge and experience to help Kira learn to exist as a biracial individual]."

I believe that these words can be read to mean only that the trial court awarded custody to Kimberly solely on the premise that she was an African-American person who will be able to provide Kira with a breadth of cultural knowledge and experience that Christopher could not, due to his race.  Despite this court's weak protest to the contrary, the remarks in the trial court's letter of opinion show that the court's decision for custody improperly hinged on the sole factor of race: that only an African-American person can properly raise a biracial child in this society.

An award of custody based solely on race is impermissible, as an improper exercise of a trial  court's discretion. Fountaine v. Fountaine, 9 Ill. App. 2d 482, 486 (1956).  The United States Supreme Court has also specifically rejected the consideration of racial biases, or the effects of racial prejudice and classifications, in child custody matters as a violation of the equal protection clause of the United States Constitution (U.S. Const., amend. XIV). Palmore v. Sidoti, 466 U.S. 429, 432, 80 L. Ed. 2d 421, 425, 104 S. Ct. 1879,

1881-82 (1984). Thus, the trial court here erroneously used race as its basis for awarding custody.

Finally, the trial court erred in allowing in any capacity the opinion testimony of both Dr. Alexander and Dr. Thomas. Dr. Hynan and Dr. Hatcher, the experts with the stipulated expertise in rendering custody opinions, refuted the race and gender opinions that Dr. Alexander and Dr. Thomas rendered while attacking Drs. Hynan's and Hatcher's testing, evaluations, and custody recommendations. Both Dr. Hynan and Dr. Hatcher testified that the bases for the opinions offered by Dr. Alexander and Dr. Thomas had no validity or known acceptance of any kind within their scientific field. Accordingly, the opinions rendered by Dr. Alexander and Dr. Thomas did not meet the Frye test. See Frye v. United States, 293 F. 1013 (D.C. Cir. 1923). In Illinois, the admission of expert testimony is governed by the standard first expressed in Frye. In re Commitment of Simons, 213 Ill. 2d 523, 529 (2004); Donaldson v. Central Illinois Public Service Co., 199 Ill. 2d 63, 76-77 (2002).

Commonly called the "general acceptance" test, the Frye standard dictates that scientific evidence is admissible at trial only if the methodology or scientific principle upon which the opinion is based is "sufficiently established to have gained general acceptance in the particular field in which it belongs." Frye, 293 F. at 1014. In this context, "general acceptance" does not mean universal acceptance, and it does not require that the methodology in question be accepted by unanimity, consensus, or even a majority of experts. Simons, 213 Ill. 2d at 530. Instead, it is sufficient that the underlying method used to generate an expert's opinion is reasonably relied upon by experts in the relevant field. Simons, 213 Ill. 2d at 530. Significantly, the Frye test applies only to "new" or "novel" scientific methodologies. Simons, 213 Ill. 2d at 530. "Generally, however, a scientific technique is 'new' or 'novel' if it is 'original or striking' or does 'not resembl[e] something formerly

known or used.' " Donaldson, 199 Ill. 2d at 79, quoting Webster's Third New International Dictionary 1546 (1993).

Drs. Alexander's and Thomas's opinions should have been admitted only if their methods were sufficiently established to have gained general acceptance in the particular field in which they belong. Because their methods were not affirmatively shown to be generally accepted in the field of child custody, their opinions should not have been considered by the trial court. Frye, 293 F. 1013. This court cites Snelson v. Kamm, 204 Ill. 2d 1 (2003), for the proposition that, if a party does not request a Frye hearing, the party has waived the Frye issue on appeal. I believe that the holdings of Snelson do not apply to the mixed questions of fact and law in this case. See Quinlan, 355 Ill. App. 3d at 836. Also, Christopher did obtain a hearing on his motion to bar the testimony of Dr. Thomas, for reasons consistent with Frye (and In re Marriage of Jawad, 326 Ill. App. 3d 141 (2001)). The court granted Christopher's motion in part, and it allowed Dr. Thomas to testify only about the testing techniques of Drs. Hynan and Hatcher. Also, even if a party's inaction constitutes a waiver of an issue, the party's waiver does not limit our own jurisdiction. Carlson v. City Construction Co., 239 Ill. App. 3d 211, 243 (1992). I believe that the Frye objection remains. The trial court not only abused its discretion in allowing such unprecedented testimony; it later improperly based its decision on evidence that it said it would not consider for that purpose.

APPELLATE COURT'S ERROR

This court's opinion misses the basic issues in its presentation, which includes a lengthy array of pseudo-facts, used to shore up support for its conclusions. The court even inserts its own speculations and conclusions as fact. For example, "The trial court apparently found Dr. Hatcher's and Dr. Hynan's testimony to be slightly impeached ***." (Emphasis added.) Slip op. at 35. Also, "Dr. Thomas's knowledge, experience, education, and skill *** undoubtedly aided the trier of fact in

understanding the evaluations ***." (Emphasis added.) Slip op. at 29. The trial court referenced only the removal petition as a basis for disregarding Dr. Hynan's and Dr. Hatcher's custody opinions. There is nothing of record that indicates that the trial court believed that Dr. Hynan or Dr. Hatcher was impeached by the "novel" opinions of Drs. Thomas and Alexander.

This court notes that the <u>Frye</u> test applies only to principles that are new or novel. But the court then again employs its unsupported speculations and conclusions to exclude Dr. Thomas's testimony from having to meet the <u>Frye</u> test: "Furthermore, <u>we do not believe</u> that the admission of Dr. Thomas's testimony offended the principles espoused in <u>Frye</u>. <u>Dr. Thomas's opinions were not based on new or novel methods</u>." (Emphasis added.) Slip op. at 29. There is nothing in the record to suggest that the bases for the opinions of Dr. Alexander and Dr. Thomas were anything but novel, at best, and racist, at worst.

CONCLUSION

Because the record clearly shows that the trial court's findings were against the manifest weight of the evidence, and that the trial court made errors of law, the record compellingly calls for reversal of the trial court's custody award to Kimberly, and for the award of Kira's custody to Christopher as being in Kira's best interest.